40008. EVANS et al. v. THE STATE.

PER CURIAM.

Appellants were convicted in Fulton Superior Court of violating the Georgia Racketeer Influenced and Corrupt Organizations (RICO) Act, Ga. L. 1980, pp. 405, 407, Code 1933, § 26-3402 (a) (17) (now OCGA § 16-14-3 (3) (A) (xviii)), based on predicate offenses of commercial gambling, OCGA § 16-12-22 (Code Ann. § 26-2703). On appeal they raise three enumerations of error.

1. In their first enumeration appellants contend that the court erred by refusing to grant their motions to suppress the fruits of electronic surveillance conducted by appellee.

The evidence at trial showed that Walter Lee Evans participated with numerous others in a lottery ring operating in the metropolitan Atlanta area which involved gambling on the volume of stocks and bonds traded on the New York Stock Exchange.[1] The evidence was obtained pursuant to twelve surveillance (wiretap) warrants issued by a Fulton Superior Court judge upon application by the Fulton County district attorney. The defendants do not contest the fact that there was probable cause for the issuance of the warrants, nor do they contest the fact that the venue of the offenses was Fulton County. The defendants urge that the warrants were invalid because the Fulton district attorney and superior court judge were without authority to apply for and issue surveillance warrants as to telephones located outside Fulton County (i.e., outside the Atlanta Judicial Circuit).

The first warrant was issued for two telephones located at an address in Fulton County. The second warrant was issued shortly

---

[1] This case involves the same gambling ring as our recent opinion in *Waller v. State,* 251 Ga. 124 (303 SE2d 437) (1983). The only issue common to both cases is the challenge to evidence gathered by electronic surveillance devices in counties other than Fulton County pursuant to warrants obtained in Fulton County. Id., (5). However, due to a procedural default by the defendants, this issue was not resolved in *Waller.*

The same issue was raised in *Romano v. State,* 162 Ga. App. 816 (1) (292 SE2d 533) (1982) (cert. denied), but, as in *Waller,* the merits were not reached.

thereafter for three phones also located in Fulton County. Based upon information obtained from the preceding wiretaps, subsequent warrants were issued as to phones in DeKalb County (Stone Mountain Judicial Circuit), then Clayton County (Clayton Judicial Circuit), then Cobb County (Cobb Judicial Circuit), then Cherokee (Blue Ridge Judicial Circuit), then Rockdale County (then the Stone Mountain Judicial Circuit), then Paulding County (Tallapoosa Judicial Circuit), then Gwinnett County (Gwinnett Judicial Circuit), and finally Henry County (Flint Judicial Circuit), not to mention other phones located in Fulton County (Atlanta Judicial Circuit). In all, 41 telephones were tapped, of which 23 were located in 7 judicial circuits other than the Atlanta Judicial Circuit, pursuant to warrants sought and obtained in Fulton County.

In order to discuss the issues involved in this case, it is necessary to describe in some detail the equipment used for the surveillance. The Fulton district attorney's surveillance team worked out of a rented motel room near the intersection of Sylvan Road and Interstate 85, in Hapeville, Fulton County (the "listening post"). The initial step in the installation of each of the wiretaps was to present the court order authorizing the wiretap to the telephone company, which then selected an "appearance point" and informed the investigators of its location. An "appearance point" was a site, located at some point between the telephone to be tapped and the telephone company central switching office servicing it, where the line to be tapped, also known as the "subscriber line," converged with another telephone line running to the central switching office, with the latter line being leased to the district attorney (the "leased line"). All of the appearance points assigned for the surveillances involved in this case were located in neighborhood junction boxes, also known as terminal boxes, which (for purposes of this appeal) were located in the same county as the telephone to be tapped.

The evidence showed that the simplest method of installing a tap would have been to proceed to the junction box and to use jumper wires to connect the terminals, otherwise known as binding posts, of the subscriber line to the terminals of the line leased to the district attorney. Such an apparatus would have conducted the electronic signal of the tapped phone conversation over the leased line to the central switching office, and thence to the listening post in Fulton County. However, this arrangement would have presented a serious risk of detection by criminal suspects, because it would have caused a drop in voltage measurable by equipment available to commercial gamblers. To forestall detection, an inductor coil/jumper wire, placed in the neighborhood terminal box, and a control unit, located at the

listening post, were used.

Sgt. John Woodard, a nine-year veteran of the Atlanta Police Department who has taken several courses in physics and electricity, testified that he installed the surveillance equipment used in this case. He testified that the inductor coil/jumper wire is a piece of equipment consisting essentially of two magnetic coils and four lead wires. He said that his installation procedure was to go to the junction box servicing each subscriber phone, open it, and locate the terminals for the subscriber phone and the leased line. He would then connect two lead wires of the inductor coil to the subscriber phone's terminals, and the remaining lead wires to the leased phone's terminals.

Woodard testified that the surveillance team's listening post in Hapeville contained three pieces of equipment: the control unit, a computerized pen register, and a tape recorder. He said that, after the inductor coil was installed, surveillance was initiated by dialing a telephone number assigned to the district attorney by the telephone company. Calling this number activated the inductor coil by sending electrical current through it. According to Woodard, whenever the tapped phone was taken off the hook, the signal from that telephone passed through the inductor coils to the leased line. This signal then was conducted over the leased line to the telephone switching office, and from there to the listening post in Hapeville. (According to Woodard, wiretaps using inductor coils and control units do not drain a measurable amount of voltage from subscriber lines.)

There was additional testimony by Woodard that when the signal reached the listening post, it passed through the control unit to the computerized pen register, and then to the tape recorder. The function of the pen register was to record on paper tape the date and time that the tapped phone was taken off the hook; whether the call was incoming or outgoing; if outgoing, the number dialed; and the time the call ended. The tape recorder aurally recorded the conversation on magnetic tape.

The primary issue raised by the first enumeration of error is whether the Fulton district attorney was authorized by federal and state law to apply for surveillance warrants for the telephones which were located outside of Fulton County and whether the Fulton Superior Court judge was statutorily authorized to issue them. If not, the evidence obtained by such extraterritorial warrants should be suppressed. 18 USCA § 2515; OCGA § 16-11-67 (Code Ann. § 26-3007).

To start, we must emphasize that the issues in this case are not merely ones of interpretation of state statutes. Instead, as pointed out by the Court of Appeals in *Cox v. State,* 152 Ga. App. 453 (1) (263

SE2d 238) (1979), "In 1968 the Congress enacted the Omnibus Crime Control and Safe Streets Act, a portion of which dealt with the interception and disclosure of wire or oral communications. 18 USCA § 2510 et seq. [18 USCA Ch. 119]. The act set down procedures whereby federal authorities could secure an authorization for wiretaps. It further provided for concurrent state regulation of wiretaps subject, at the minimum, to the requirements of the federal legislation. . . ." *Cox,* supra, 152 Ga. App. at 454. "Georgia has enacted such a statute and the wiretaps at issue in the instant case were made pursuant to this Georgia statute. [OCGA § 16-11-64 (Code Ann. § 26-3004).] Which law, state or federal, controls? '(D)espite the fact that the interceptions were made pursuant to a state court authorization, at the very least the other requirements of Title III (of the Omnibus Crime Act) . . . must be satisfied. But whether the proceedings be federal or state, interpretation of a state wiretap statute can never be controlling where it might impose requirements less stringent than the controlling standard of Title III. If a state should set forth procedures *more* exacting than those of the federal statute, however, the validity of the interceptions and the orders of authorization by which they were made would have to comply with that test as well. (Cits.)' United States v. Marion, 535 F2d 697, 702 (2d Cir. 1976). (Cits.) Thus, '(w)iretapping and surveillance are the subjects of federal and state law and *both must be complied with where applicable.*' Orkin v. State, 236 Ga. 176, 179 (223 SE2d 61) (1976). (Emphasis supplied.)" *Cox,* supra, 152 Ga. App. at 455. "In other words, for evidence obtained through state-authorized wiretaps to be admissible in a state criminal proceeding, it must have been obtained in a manner not inconsistent with the requirements of *both* the federal and state laws." Id. at 455-456.

The Omnibus Crime Control Act, 18 USCA § 2516 (2), provides: "'The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire or oral communications, may apply to such judge for, and such judge may grant in conformity with section 2518 of this chapter and with the applicable State statute an order authorizing, or approving the interception of wire or oral communications by investigative or law enforcement officers having responsibility for the investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of the commission of the offense of murder, kidnapping, gambling. . . ."

Section 2518, supra (18 USCA § 2518), paragraph (3), provides:

"Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire or oral communications within the territorial jurisdiction of the court in which the judge is sitting. . . ." The critical language regarding jurisdiction is "interception . . . within the territorial jurisdiction of the court," because the word "intercept" is defined to mean "the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device." 18 USCA § 2510 (4). Substituting the definition of "intercept" for the word "interception" in 18 USCA § 2518 (3), quoted above, that section provides that, upon application, the judge may enter an order authorizing the aural acquisition of wire or oral communications within the territorial jurisdiction of the court in which the judge is sitting. It is undisputed that the only aural acquisition of the defendant's communications occurred in the Atlanta Judicial Circuit (Fulton County) where the judge authorizing the investigative warrants was sitting. We therefore find that federal law authorized issuance of these warrants by the Fulton Superior Court judge.

Defendants point out that 18 USCA § 2518 (1) (b) (ii) provides that the application must include "a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted. . . ." Defendants argue that, according to our interpretation, the foregoing would require a description of the nature and location of the listening post rather than a description of the nature and location of the facility housing the telephone to be tapped. However, the Omnibus Crime Control Act applies to "oral communication" in addition to "wire communication" (telephone), 18 USCA § 2510 (1) (2), and prohibits the use of miniature transmitters and microphones in transmitting "oral communications," Senate Report No. 1097, 90th Cong., 2d Sess., 535-536 (1968). We therefore agree with defendants that the phrase "facilities from which . . . the communication is to be intercepted" refers to the facility housing the telephone to be tapped, see 18 USCA § 2518 (3) (d), but we find that the phrase "place where the communication is to be intercepted" refers to the place of interception of oral communications by such means as miniature transmitters and microphones, not to the listening post where the communications are heard. The same analysis (separating "wire" from "oral communications" and applying the word "facilities" to the former and the word "place" to the latter) is applicable to 18 USCA § 2518 (3) (d) and 18 USCA § 2518 (4) (b).

Recognizing that the provisions relied upon by defendants, 18 USCA §§ 2518 (1) (b) (ii), (3) (d) and (4) (b), supra, do not relate directly to the question of jurisdiction here in issue, but do relate to

the location of the offense, 18 USCA § 2518 (3) (d), and apply to both wire and oral communications, we adhere to our conclusion that the jurisdictional provision of the federal law, 18 USCA § 2518 (3), confers jurisdiction on a superior court judge to authorize interception (aural acquisition) of wire communications within his territorial jurisdiction.

We turn now to state law, which involves not the place of interception (aural acquisition), but the place where a "device" is physically placed. OCGA § 16-11-64 (b) (Code Ann. § 26-3004) provides: "When in the course of his official duties, a law enforcement officer desiring to make use of any device, but only as such term is specifically defined by Code Section 16-11-60 (Code Ann. § 26-3009) . . . the law enforcement officer shall act only in compliance with the procedure provided for in this subsection: (1) When there is probable cause to believe that a . . . person is committing or has committed . . . any crimes involving . . . gambling . . . or there is probable cause to believe that a private place is being utilized or has been utilized for the commission of any such crime, then, upon written application, under oath, of the *district attorney of the circuit wherein the device is to be physically placed*. . . any judge of the superior court *of the circuit aforesaid* may issue an investigation warrant permitting the use of devices, as defined by Code Section 16-11-60 (Code Ann. § 26-3009), for the surveillance of such person or place. . . ." (Emphasis supplied.)

The word "device" is defined in OCGA § 16-11-60 (1) (Code Ann. § 26-3009) as "an instrument or apparatus used for overhearing, recording, intercepting, or transmitting sounds . . . and which involves in its operation electricity [or] electronics. . . ." The dispute between the parties now centers on the question of which of the pieces of equipment used by the district attorney — the inductor coil on the one hand, or the control unit, computerized pen register and particularly the tape recorder, on the other hand, — were "devices" within the purview of § 16-11-60 (1) (Code Ann. § 26-3009) for the purpose of establishing jurisdiction under § 16-11-64 (1) (b) (Code Ann. § 26-3004).

Defendants urge that because the inductor coil, a piece of equipment essential to the success of the wiretap, both "intercepted" sounds and "transmitted" them to the listening post in Hapeville, the coil was a wiretap "device" under § 16-11-60 (1) (Code Ann. § 26-3009). It is their further contention that, because the state installed the coils in junction boxes located in counties outside the Atlanta Judicial Circuit, the devices were "physically placed" in those other circuits, and that therefore the Fulton district attorney lacked statutory authority to apply for the warrants and the Fulton Superior Court judge lacked jurisdiction to issue them.

However, if the district attorney of the Stone Mountain Judicial Circuit had applied for and obtained the third warrant from a superior court judge in that circuit, the defendants could argue, and would be justified in arguing, that although the inductor coil was placed in DeKalb County, the "devices" for "intercepting," "recording" and "overhearing" their communications were physically placed in Hapeville, outside the Stone Mountain Judicial Circuit, and thus their communications should be suppressed. To avoid this undeniably correct argument, a separate "recording" device either would have to be placed and monitored in the Stone Mountain Judicial Circuit, not to mention the six other circuits involved, or duplicate warrants would have to be applied for and issued in each circuit in each instance. We find no indication that the General Assembly intended to require that separate recording devices be utilized or that duplicate warrants be issued and conclude that such was not intended. We therefore must apply the law as written, to a factual situation possibly not envisioned by the General Assembly.

The purpose of the General Assembly in enacting the law in question, insofar as telephone and other private communications are concerned, was to prevent such private conversations from being overheard by unauthorized persons. We therefore interpret the word "intercepting" in OCGA § 16-11-60 (1) (Code Ann. § 26-3009), like its federal counterpart, as "aural acquisition." Similarly, we find that the word "transmitting" in OCGA § 16-11-60 (1) (Code Ann. § 26-3009) was included to cover such instruments and apparatus as miniature transmitters and microphones used to overhear private conversations other than those conducted by telephone. Compare paragraph (1) of OCGA § 16-11-62 (Code Ann. § 26-3001) with paragraph (4) thereof. We therefore conclude that the inductor coil involved here was not a device used to overhear, record or intercept defendant's conversations within the meaning of OCGA §§ 16-11-60 (1) (Code Ann. § 26-3009), 16-11-64 (b) (1) (Code Ann. § 26-3004). The coil was a device to prevent detection of those devices being used to overhear and record defendants' conversations, which devices were physically located in Fulton County. We are supported in this conclusion by the fact that had these officers proceeded as they did but without a warrant, their offense [interception of a telephone communication; OCGA § 16-11-62 (4) (Code Ann. § 26-3001)] would have been committed in Fulton County and they could have been prosecuted there.

Thus, the district attorney and superior court judge of the Atlanta Judicial Circuit were authorized to apply for and issue the warrants here in issue where the listening post as well as the gambling

were located in Fulton County. The trial court did not err in denying defendants' motions to suppress.

2. In their second enumeration of error appellants claim that the trial court erred by overruling their general demurrer to the indictment. In the demurrer filed with the trial court, appellants contended that the Georgia RICO act violated both the ex post facto and retroactivity proscriptions of Const. 1976, Art. I, Sec. I, Par. VII (Code Ann. § 2-107) (now, with minor editorial changes, Const. 1983 Art. I, Sec. I, Par. X (Code Ann. § 2-110)). Const. 1976, Art. I, Sec. I, Par. VII (Code Ann. § 2-107) provided that, "[n]o bill of attainder, ex post facto law, retroactive law, or law impairing the obligation of contracts, or making irrevocable grant of special privileges or immunities, shall be passed." During a motions hearing in the trial court, appellants abandoned their reliance on the prohibition against ex post facto laws, and argued only that the RICO act is unconstitutionally retroactive. On appeal they emphasize that they are not contending that RICO is an ex post facto law, but that RICO is unconstitutionally retroactive because, by defining "pattern of racketeering activity" as "engaging in at least two incidents of racketeering activity . . . provided at least one of such incidents occurred after July 1, 1980 . . .," it assigns essentially different effects to commercial gambling transactions which occurred prior to that date. See OCGA § 16-14-3 (2) (Code Ann. § 26-3402).

There are two reasons this argument has no merit. First, the history of our state Constitution shows that the term "retroactive law" applies exclusively to constitutional challenges to civil statutes, and that a challenge to RICO's constitutionality on the ground of retrospectivity must be raised, if at all, on the basis that it is an "ex post facto law." See *Williams v. State,* 213 Ga. 221 (98 SE2d 373) (1957); *Bailey v. State,* 210 Ga. 52, 54 (77 SE2d 511) (1953); *Bussey v. Bishop,* 169 Ga. 251, 256 (150 SE 78) (1929); *Boston & Gunby v. Cummins,* 16 Ga. 102, 106-107 (1854). Appellants having specifically abandoned their ex post facto challenge, there is nothing for us to review.

Second, even were this court to treat this enumeration as raising an ex post facto issue, we would find no error. "[I]t long has been the law that before a statute can be attacked by anyone on the ground of its unconstitutionality, he must show that its enforcement infringes upon some right of his and that the infringement results from the unconstitutional feature of the statute upon which he bases his attack. [Cits.] He must show that he is within the class of persons with respect to whom the Act is unconstitutional. [Cits.]" *State v. Raybon,* 242 Ga. 858, 862 (252 SE2d 417) (1979). " ' "In order to raise a question as to the constitutionality of a 'law,' at least three things

must be shown: (1) The statute or the particular part or parts of the statute which the party would challenge must be stated or pointed out with fair precision; (2) the provision of the Constitution which it is claimed has been violated must be clearly designated; and (3) it must be shown wherein the statute, or some designated part of it, violates such constitutional provision." ' [Cits.]" *Wallin v. State,* 248 Ga. 29, 30 (279 SE2d 687) (1981). Appellants have failed to show that any of the predicate transactions of commercial gambling which formed the basis of their convictions occurred prior to July 1, 1980, and they therefore have failed to carry their burden to demonstrate how the RICO statute, as applied to them, violated Const. 1976, Art. I, Sec. I, Par. VII (Code Ann. § 2-107). Accordingly, their attack on the statute is insufficient.

3. Appellants' final enumeration of error concerns their argument that the trial court erred by denying two of their requested jury charges. The record shows that the court instructed the jury on the indicted RICO offense, as well as the predicate offenses of commercial gambling, OCGA § 16-12-22 (Code Ann. § 26-2703). Appellants claim the trial court erred by failing to charge on the offenses of keeping a gambling place, OCGA § 16-12-23 (Code Ann. § 26-2704), and communicating gambling information, OCGA § 16-12-28 (Code Ann. § 26-2706). Appellants do not contend that communicating gambling information and keeping a gambling place are as a matter of law or as a matter of fact lesser included offenses of commercial gambling, see *Romano v. State,* 162 Ga. App. 816 (2) (292 SE2d 533) (1982); *Baxter v. State,* 134 Ga. App. 286, 294 (4) (214 SE2d 578) (1975), or of the RICO statute, but instead argue that they were entitled to the omitted instructions because the indictment used language sufficient to embrace those offenses. In support, they cite the "same transaction" rule first announced in *Goldin v. State,* 104 Ga. 549 (1, 2) (30 SE 749) (1898). Accord, *State v. Williams,* 247 Ga. 200 (2) (275 SE2d 62) (1981); *Rowe v. State,* 166 Ga. App. 836 (305 SE2d 624) (1983); *Nelson v. State,* 136 Ga. App. 861 (222 SE2d 677) (1975). We disagree.

Pretermitting the issue of whether the RICO indictment in the instant case used language sufficient to embrace §§ 16-12-23 (Code Ann. § 26-2704) and 16-12-28 (Code Ann. § 26-2706), we do not think that the *Goldin* rule is apposite. In *Goldin* this court held that "[i]t is an elementary principle of criminal procedure that no person can be convicted of any offense not charged in the indictment. There may, of course, be a conviction of a lesser offense than that expressly named in the indictment, where the former is necessarily included in the latter, and also in some cases in which the lesser is not so included in the greater offense but where the language used in the indictment is

sufficient to embrace the smaller offense." Id., 104 Ga. at 550. *Goldin* and its progeny dealt with issues of whether a given count of an indictment alleged more than one separate and distinct offense, and hence was fatally duplicitous, *Williams,* supra, 247 Ga. at 203-204, and whether a defendant's conviction of a given offense was unauthorized because that offense was not included in the indictment, *Rowe,* supra, 166 Ga. App. 836. These issues are not raised by appellants; instead, the question they frame is, assuming an indictment's language is sufficient to embrace an offense for which the defendant is not being tried, and which is not a lesser included offense of the offense for which he is on trial, whether the defendant has a right to have the jury instructed as to the offense to which he is not made to defend. The answer is in the negative.

In *Myers v. State,* 97 Ga. 76, 78 (25 SE 252) (1895), this court held that "[t]hough submitted in writing, requests for instructions to the jury based upon theories of the law which, upon no candid view of the pleadings and evidence, are involved in the issues being tried, should be disregarded by the court...." More recently, in the course of establishing uniform rules for determining under what circumstances a trial court should charge the jury on lesser included offenses, *State v. Stonaker,* 236 Ga. 1 (222 SE2d 354) (1976), this court set forth the rule that "(1) The trial judge must charge the jury on each crime specified in the indictment or accusation, unless the evidence does not warrant a conviction of such crime, or unless the state has affirmatively withdrawn a crime or stricken it from the indictment or accusation." Id. at 2. Although the indictment in this case may have included language which arguably charged appellants with violating §§ 16-12-23 (Code Ann. § 26-2704) and 16-12-28 (Code Ann. § 26-2706), and the evidence presented during trial may have warranted convictions thereon, appellants were neither tried nor convicted of those offenses, and, to the extent that the indictment could be interpreted as implicitly charging appellants with them, we hold that appellee impliedly withdrew them from consideration. See also *State v. Hightower,* 252 Ga. 220 (312 SE2d 610) (1984). We find no error.

*Judgment affirmed. All the Justices concur, except Clarke, Smith and Bell, JJ., who dissent.*

DECIDED MARCH 15, 1984 —
REHEARING DENIED MARCH 28, 1984.

*Jones & Worozbyt, Theodore S. Worozbyt, William A. Morrison,* for appellants.

*Lewis R. Slaton, District Attorney, H. Allen Moye, Assistant District Attorney,* for appellee.

GREGORY, Justice, concurring.

I agree with all that is said in the majority and add these thoughts with regard to Division One of the opinion. OCGA § 16-11-60 (1) (Code Ann. § 26-3009) defines "device" as "an instrument or apparatus used for overhearing, recording, intercepting or *transmitting sounds . . .* and which involves in its operation electricity [or] electronics. . . ." (Emphasis supplied.) *The American Heritage Dictionary of the English Language,* (1980), defines "sound" as "a vibratory disturbance in the pressure and density of a fluid, or in the elastic strain in a solid, with frequency in the approximate range between 20 and 20,000 cycles per second, and *capable of being detected by the organs of hearing.*" (Emphasis supplied.)

Electrical impulses in telephone wires are not sounds. The induction coils placed outside the Atlanta Judicial Circuit intercepted electrical impulses, but not sounds. At the earliest, sounds were intercepted when these electrical impulses were recorded in Fulton County.

The right of privacy is the thing to be protected by OCGA Title 16, Ch. 11, Art. 3 (Code Ann. § 26-3001 et seq.). That right is not violated by the interception of an electrical impulse any more than the *interception* of a letter in the mail violates that right. Of course, the potential for violation exists in both cases. But it is only the opening and reading of the letter on one hand, and, at least, the recording and, perhaps, hearing on the other, which violates one's right of privacy. Our legislature chose to use the word "sound" rather than a broader term which might include an electrical impulse.

I note that both the state and federal statutes contain safeguards. There is an obligation to destroy all matter obtained by surveillance if evidence of one of the specific crimes set forth in the wiretap law has not been obtained within 30 days, and to certify this fact under oath in writing to the judge who issued the warrant. OCGA § 16-11-64 (b) (6) (Code Ann. § 26-3004). If information of such a crime *is* obtained, the prosecuting attorney must notify the accused of the existence and substance of the evidence or information, and must make it available for inspection and copying if it has been reduced to permanent form. OCGA § 16-11-64 (b) (7) (Code Ann. § 26-3004). An exclusionary rule exists by statute. OCGA § 16-11-64 (b) (8) (Code Ann. § 26-3004). Violations of the wiretap law are misdemeanors, OCGA § 16-11-83 (Code Ann. § 26-9931a), and can support actions for invasion of privacy, OCGA § 16-11-64 (b) (8)

(Code Ann. § 26-3004). Violations of the federal law can lead to awards of actual damages, punitive damages and attorney fees. 18 USCA § 2520. These sanctions should assure sufficient restraint upon law enforcement officials and provide adequate protection to the right of privacy.

I am authorized to state that Justice Weltner joins in this concurrence.

BELL, Justice, dissenting.

Because today's majority opinion produces a result squarely contradictory to the fundamental intent of our electronic surveillance statute, I dissent.

This case turns upon whether the inductor coils utilized by the Fulton district attorney's surveillance team are "devices" within the meaning of OCGA § 16-11-60 (1) (Code Ann. § 26-3009). If they are, then the warrants issued in this case were defective, as they were not applied for or issued in the circuit where these "devices" were physically placed. OCGA § 16-11-64 (b) (Code Ann. § 26-3004); § 16-11-60 (1) (Code Ann. § 26-3009).

The majority, showing undue concern with administrative inconvenience (majority opinion at 318), concludes that inductor coils are not devices within the meaning of OCGA § 16-11-60 (1) (Code Ann. § 26-3009).

I cannot agree. First, as a matter of fact, an inductor coil is clearly a device within the meaning of our surveillance statute. The state's own expert described how the inductor coils utilized by the state functioned. He said that whenever the target phone was being used, the electronic signal from the telephone passed through the magnetic coil which was attached by lead wires to the subscriber line's terminals, setting up an electromagnetic field within the inductor coil, which in turn reproduced the electronic signal within the magnetic coil which was attached by lead wire to the terminals on the line leased by the district attorney.[1] In view of this description of the function of an inductor coil, there can be no doubt that inductor coils clearly qualify as instruments or apparatuses which electronically intercept and transmit sounds within the facial meaning of OCGA § 16-11-60 (Code Ann. § 26-3009).

---

[1] The majority apparently finds that the federal definition of "device" should control the definition of the term as used in OCGA Title 16, Ch. 11, Art. 3, Pt. 1 (Code Ann. § 26-3001 et seq.). But, this conclusion ignores the plain language of OCGA § 16-11-64 (Code Ann. § 26-3004), which speaks in terms of "a device, *but only as such term is specifically defined by Code Section 16-11-60 (Code Ann. § 26-3009),*" (emphasis supplied), and of "investigation warrants permitting the use of devices, *as defined by Code Section 16-11-60 (Code Ann. § 26-3009),*" (emphasis supplied).

This conclusion is also compelled by a consideration which is crucial to the resolution of this case, but is ignored by the majority — an examination of the Congressional policy underlying the federal, and I believe our own, surveillance statute. Congress clearly intended that applications for wiretaps be sought, to the greatest extent practicable, under a uniform, consistent policy. "Paragraph (2) [18 USCA 2516 (2)] provides that the principal prosecuting attorney of any State or the principal prosecuting attorney of any political subdivision of a State may authorize an application to a State judge of competent jurisdiction . . . for an order authorizing the interception of wire or oral communications. The issue of delegation by that officer would be a question of State law. In most States, the principal prosecuting attorney of the State would be the attorney general. The important question, however, is not name but function. *The intent of the proposed provision is to provide for the centralization of policy relating to statewide law enforcement in the area of the use of electronic surveillance in the chief prosecuting officer of the State. . . .* Where no such office exists, policymaking would not be possible on a statewide basis; it would have to move down to the next level of government . . . In most States, the principal prosecuting attorney at the next political level of a State, usually the county, would be the district attorney. . . . *The intent . . . is to centralize areawide law enforcement policy in him. . . .* Where there are both an attorney general and a district attorney, either could authorize applications, the attorney general anywhere in the State and the district attorney anywhere in his county." S. Rep. No. 1097, 90th Cong., 2d Sess., 98 (1968) (emphasis supplied), cited in United States v. Giordano, 416 U. S. 505, 522, fn. 11 (94 SC 1820, 40 LE2d 341) (1974).

It was unquestionably the intent of Congress and our General Assembly to centralize in our state Attorney General cross-jurisdictional law enforcement in the area of the use of electronic surveillance, and to centralize electronic surveillance within any given circuit in the hands of that circuit's district attorney. Although it is not the duty of this court to find ways to circumvent clear legislative intent, the majority has effectively done so in the instant case, as its opinion will produce results squarely

---

Because the General Assembly clearly intended that OCGA § 16-11-60 (Code Ann. § 26-3009) supply the sole definition of the term "device" governing state surveillance warrants, and because OCGA § 16-11-60's (Code Ann. § 26-3009) definition of that term is considerably more comprehensive than that of 18 USCA § 2510 (4) and (5), I do not consider the federal statute to be controlling on this point, and find that the broader definition of the state statute must be followed. *Cox v. State,* 152 Ga. App. 453, 454-456 (263 SE2d 238) (1979).

contradictory to the intent of Congress and our General Assembly. Under the majority's rationale, the district attorney of any judicial circuit in Georgia can now apply to a judge in his circuit for a warrant authorizing the interception of wire or oral communications in any or all of the 159 counties of the State of Georgia. Moreover, the citizens of any given judicial circuit will now be subject to electronic surveillance warrants taken out by the Attorney General, their own district attorney, and any district attorney of the other forty-four judicial circuits of this state. I think that the potential impact on personal privacy of a total of forty-six uncoordinated, and, possibly, significantly conflicting state prosecutorial policies is clearly contrary to the fundamental intent of Congress and of our General Assembly, and should be disallowed. In conclusion, I find that under the facts of this case the Fulton district attorney did not have authority to apply for warrants for surveillance of telephones physically placed outside his own circuit; that the Fulton superior court judge had no authority to issue them; and that the evidence obtained pursuant to the defective warrants should have been suppressed.

For the above reasons, I would reverse the appellants' convictions.