Josephine CASTILLO, Ysidro Castillo Sr., and Jose Morones,

v.

The STATE of Texas, Appellee.

Nos. 339–89 to 341–89.

Court of Criminal Appeals of Texas, En Banc.

Oct. 31, 1990.

Rehearing Overruled June 12, 1991.

Douglas D. Mulder and John H. Hagler, Dallas, for appellants.

Patrick C. Batchelor, Dist. Atty., Corsicana, Jim Vollers, Sp. Prosecutor, and Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANTS' PETITION FOR DISCRETIONARY REVIEW

CAMPBELL, Judge.

Appellants Josephine Castillo, Ysidro Castillo Sr., and Jose Morones were tried jointly and found guilty of the offense of engaging in organized criminal activity by conspiring with Gilberto Salinas and Flavio Quintanilla to deliver more than 200 pounds but less than 2000 pounds of marihuana. Tex.Penal Code § 71.02(a)(5). The jury assessed punishment for each of the Castillos at imprisonment for 75 years and a $100,-000 fine. Morones' punishment was assessed by the jury at imprisonment for 15 years and a $100,000 fine. The Tenth Court of Appeals, sitting in Waco, affirmed all three convictions. 761 S.W.2d 495. We granted appellants' joint petition for discretionary review, pursuant to Texas Rule of Appellate Procedure 200(c)(4), in order to determine whether the court of appeals correctly interpreted the wiretap authorization provision contained in Article 18.20, § 3 of the Texas Code of Criminal Procedure. Concluding that the court of appeals erred in its interpretation but that the error was harmless, we will affirm the judgment of the court of appeals.

On March 23, 1987, the Ellis County district attorney and the Navarro County criminal district attorney made application to the Honorable Mace B. Thurman, 147th district court judge of Travis County, for orders authorizing wiretaps on the Ellis County telephones of Nickey Rutledge and Carolina Castillo. Judge Thurman, the judge lawfully empowered to order electronic "intercepts" in the Third Administrative Judicial District, issued the intercept orders as requested, although Ellis County is located in the adjacent First Administrative Judicial District. *See* Tex.Gov't Code § 74.042(b). The listening post for the wiretaps, however, was located in Navarro County, which *is* in the Third Administrative Judicial District. *See* Tex.Gov't Code § 74.042(d). On March 31, the Navarro County criminal district attorney requested and obtained from Judge Thurman an order authorizing a third wiretap, this time on the Navarro County telephone of appellant Josephine Castillo. The probable cause affidavit for the third wiretap relied in part on information derived from the first two wiretaps.

On April 13, 1987, officers of the Texas Department of Public Safety tape-recorded a conversation acquired through the third wiretap. *See* Appendix. The contents of that conversation were admitted in evidence at appellants' trial over their objection. Appellants argued that the contents of the conversation should be suppressed under Article 18.20, § 2 (wiretap statute exclusionary rule) because the conversation was acquired through an unlawfully authorized wiretap. More specifically, appellants argued that under Article 18.20, § 3(b), Judge Thurman had no power to authorize the Ellis County wiretaps because that county is not in Judge Thurman's administrative judicial district; that all information derived from the Ellis County was therefore tainted; and that all information from the Navarro County wiretap was also tainted because that wiretap was authorized in part based on information obtained from the Ellis County wiretaps. *See United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) (under Title III, faulty authorization of ini-

tial wiretap application invalidated extension order and tainted evidence derived from extension order); *United States v. Spagnuolo*, 549 F.2d 705, 711 (9th Cir.1977) (when evidence from wiretap # 1 is tainted and used as probable cause to obtain wiretap # 2, evidence from wiretap # 2 is also tainted); J. Carr, *The Law of Electronic Surveillance* § 6.4(b)(2) at 6–95 (1990) ("Where it is later determined that the original [wiretap] order was improperly requested, issued, or executed, and the evidence derived therefrom is suppressed, any subsequent eavesdropping orders based on information derived from the original surveillance may be tainted.").

The Waco court of appeals, relying upon *Evans v. State*, 252 Ga. 312, 314 S.E.2d 421 (1984), held that under Article 18.20, § 3(b), a telecommunication is electronically "intercepted" wherever it is "heard and recorded" by law enforcement personnel, and that since the Ellis County conversations were heard and recorded at the Navarro County listening post, "Judge Thurman was a proper judge to issue the intercept order[s]." 761 S.W.2d at 505. The court of appeals held in the alternative that exigent circumstances existed to warrant Judge Thurman's first two intercept orders under Article 18.20, § 3(c):

> The [original] application stated the location of the telephones in Ellis County were small communities; that 30 officers would be required to maintain them; that there was danger of compromise of the investigation if monitoring occurred in Ellis County; and that there was close association between two of the parties to be monitored and an Ellis County police officer, and there was information concerning "pay off" of the Sheriff.

Since the exigent circumstances existed, the prosecutors were authorized under Article 18.20(3)c to apply to the Third Judicial District for the order[s].

*Id.*

 In their petition for discretionary review, appellants reiterate their argument that the contents of the April 13, 1987, telephone conversation should be suppressed.[1] In its reply brief, the State argues that the court of appeals correctly interpreted Article 18.20, § 3.[2]

In 1968 Congress passed Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510–2521. Title III regulates the electronic and mechanical interception of wire, oral, and electronic communications by government officials and private citizens. Title III also authorizes state legislatures to enact electronic surveillance statutes as long as those statutes "afford subjects of investigations at least as much protection from improper interception of protected communications as is afforded by the federal [statute]." G. Dix, *The 1981 Texas Electronic Surveillance Statute*, 7 T.Mar.L.Rev. 59, 60 (1981).

In 1981, the Texas Legislature passed its own electronic surveillance statute, Article 18.20 of the Texas Code of.Criminal Procedure. On April 13, 1987, §§ 1(3) and 3(a)-(c) of Article 18.20 read in relevant part:

> Sec. 1(3) "Intercept" means the *aural acquisition of the contents* of a wire or oral communication through the use of an electronic, mechanical, or other device.

\* \* \* \* \* \*

---

1. Appellants also complain that "[i]n a sense, all evidence in this case flow[ed] from information obtained from the use of [unlawfully authorized] electronic surveillance." Appellants' Brief at 7. Thus, if we interpret appellants' brief correctly, they are contending that *all* of the State's evidence should have been suppressed. However, because appellants do not direct us to any place in the record where this argument was made to the trial court, we consider the argument inadequately briefed and will not address it. *See* Tex.R.App.P. 74(f) and 203.

2. The State also argues that if the allegedly tainted information is deleted from the probable cause affidavit for the third wiretap, the affidavit still establishes probable cause to support the wiretap. *See Brown v. State*, 605 S.W.2d 572 (Tex.Cr.App.1980). The State does not cite to us, however, any particular pages or allegations in the 21–page affidavit or the 53 pages of other affidavits incorporated into it by reference. Under these circumstances, we consider the argument inadequately briefed and will not address it.

Sec. 3(a) The presiding judge of the court of criminal appeals ... shall appoint one district judge from each of the administrative judicial districts[3] of this state to serve ... as the judge of competent jurisdiction within that administrative judicial district....

(b) Except as provided by Subsection (c) of this section, only the judge of competent jurisdiction *for the administrative judicial district in which the proposed interception will be made* may act on an application for authorization to intercept wire or oral communications.

(c) If the judge of competent jurisdiction for an administrative judicial district is absent or unable to serve or *if exigent circumstances exist,* the application may be made to the judge of competent jurisdiction *in an adjacent administrative judicial district....*

Act of June 1, 1981, 67th Leg., R.S., ch. 275, 1981 Tex.Gen.Laws 729, *amended by* Act of June 16, 1989, 71st Leg., R.S., ch. 1166, §§ 2 & 3, 1989 Tex.Gen.Laws 4783 (emphasis added). The definition of "intercept" was taken essentially verbatim from 18 U.S.C. § 2510(4).[4]

■ Our initial task is to ascertain the meaning of the terms "aural acquisition" and "interception" as used in §§ 1(3) and 3(b). In the interpretation of these sections, we must, of course, attempt to effectuate the collective "intent" or "purpose" of the Legislature. *Camacho v. State,* 765 S.W.2d 431 (Tex.Cr.App.1989). We may consider the legislative history of the statute as well as the consequences of any particular construction. Tex.Gov't Code §§ 311.023(3) & (5).[5] We must presume that the Legislature intended a reasonable result. Tex.Gov't Code § 311.021(3). Finally, because § 1(3) was borrowed from the federal wiretap statute, it is appropriate for us to consider the construction placed upon the federal statute by other

courts. *State v. Klein,* 154 Tex.Crim. 31, 224 S.W.2d 250 (App.1949).

Our research reveals two cases in which appellate courts, facing similar factual patterns, have interpreted the identical "aural acquisition" language used in the federal statute. In the case relied upon by the court of appeals, *Evans v. State, supra,* a Georgia state superior court judge whose jurisdiction was the Atlanta Judicial Circuit authorized wiretaps on 41 telephones, 23 of which were not in the Atlanta Judicial District. The Georgia defendant argued that evidence obtained from the 23 taps outside the judge's district should be suppressed because the judge had no power under the federal statute to authorize wiretaps outside his territorial jurisdiction. The Georgia Supreme Court held, though, that because the listening post, where all the tapped communications were recorded, *was* in the Atlanta Judicial District, the superior court judge had territorial jurisdiction under the federal statute to order all 41 wiretaps. The Court held, in effect, that under the federal statute, a communication is "aurally acquired" at the place where it is heard and recorded by law enforcement personnel.

In *United States v. Nelson,* 837 F.2d 1519 (11th Cir.), cert. denied, 488 U.S. 829, 109 S.Ct. 82, 102 L.Ed.2d 58 (1988), the Eleventh Circuit reached a different conclusion. There, a Florida state judge issued wiretap orders for several telephones *within* his district, although the listening post for the taps was *outside* his district. The defendant argued that all the wiretap evidence should be suppressed because it was recorded outside the authorizing judge's district. The Eleventh Circuit held, however, that "the term 'intercept' [in the federal wiretap statute] as it relates to 'aural acquisition' refers to the place where a communication is initially obtained regardless of where the communication is ulti-

---

3. Texas is divided into nine administrative judicial districts or "regions", as the current statute reads. *See* Tex.Gov't Code § 74.042(a).

4. In 1989 the statutory definition of "intercept" was changed to "the aural *or other acquisition* of the contents of a wire, oral, or electronic communication through the use of an electronic,

mechanical, or other device." (Emphasis added.)

5. The Code Construction Act, Tex.Gov't Code §§ 311.001–311.032, applies to Article 18.20. *See* Tex.Gov't Code § 311.002(032).

mately heard [or recorded]." 837 F.2d at 1527.

Thus, the two courts that have considered the meaning of "aural acquisition" in similar situations have reached conflicting answers.

■ In our view, the language of § 3(b) plainly contemplates territorial *restriction.* Only certain judges may issue intercept orders and then only if the communications in question are to be "aurally acquired" within their respective jurisdictions. The court of appeals held that the Legislature's use of the word "aural" means that a communication is "acquired" only at the place where it is actually heard or recorded by law enforcement personnel. Professor Dix has explained, however, that "[t]his language, identical to that in the federal statute, is apparently intended [only] to impose no limitation upon the use of devices such as pen registers that enable law enforcement officers to determine the numbers called from a telephone but not to orally [sic] acquire the 'contents' of conversations." G. Dix, 7 T.Mar.L.Rev. at 63.

If the Waco court of appeals' interpretation of §§ 1(3) and 3(b) is upheld, then a wiretap at *any* location in Texas could be authorized by *any* of the nine authorizing judges. This is so because, with modern communications technology, a listening post can be established hundreds of miles from the place under surveillance. Under the court of appeals' holding, then, law enforcement officials would be free to "shop" for a sympathetic judge from which to obtain an intercept order. This would effectively destroy the territorial restrictiveness apparent on the face of the statute.

The relevant legislative history of Article 18.20, such as we have been able to find, as well as the forum shopping consequences of the court of appeals' interpretation of §§ 1(3) and 3(b), lead us to conclude that that interpretation is unreasonable and probably does not reflect the intent of the Legislature. The bill analysis prepared for House Bill 360 (later Article 18.20) states in relevant part that § 3(b) "[p]rovides for the designation by the presiding judge of the

Court of Criminal Appeals of one district judge from each administrative judicial district to hear applications for *electronic surveillance within that district.*" House Comm. on Crim.Juris., Bill Analysis, Tex. H.B. 360, 67th Leg., R.S. (1981) (emphasis added). A "common sense" reading of the bill analysis indicates that the relevant location for judicial authorization purposes is not that of the listening post but rather where the wiretap device is physically located.

For the reasons cited, we hold that, for the purposes of Article 18.20, § 3(b), a communication is "intercepted" where the wiretap device is physically placed. In this case the wiretap devices for the Ellis County telephones were physically placed in Ellis County.

■ We hold also that the State's original wiretap applications failed to demonstrate exigent circumstances warranting Judge Thurman's issuance of the original intercept orders under § 3(c). The circumstances cited by the prosecutors in their original wiretap applications were simply not exigent; i.e., they failed to show why it was not possible to ask the appropriate judge in the First Administrative Judicial District to authorize the Ellis County wiretaps. It follows that, on the facts presented, Judge Thurman had no authority to issue the intercept orders for the Ellis County telephones; that the information derived from those intercepts was tainted; and that the information derived from the third intercept, including the April 13, 1987, conversation, was similarly tainted and should not have been admitted in evidence.

■ We must now determine whether the admission of the April 13, 1987, conversation constituted reversible error. Rule 81(b)(2) of the Texas Rules of Appellate Procedure provides that an appellate court in a criminal case need not "reverse the judgment under review [if] the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or the punishment." When the error relates to improperly admitted evidence, the test "is not whether

the conviction could have been had without the improperly admitted evidence, but, instead, is whether there is a reasonable possibility that the complained of evidence might have contributed to the conviction or the punishment assessed." *Green v. State*, 727 S.W.2d 263, 267 (Tex.Cr.App.1987). Consideration of the probable impact of the improperly admitted evidence on the minds of average jurors is essential to such an inquiry. *Gauldin v. State*, 683 S.W.2d 411 (Tex.Cr.App.1984).

Eighteen witnesses testified for the prosecution at the guilt/innocence phase of the trial; none testified for the defense. The prosecution's witnesses established the following: On January 22, 1987, Linda McAllister contacted an officer of the Department of Public Safety and notified him that she had transported a large amount of marihuana for an "organization" of individuals, one of whom was appellant Ysidro Castillo Sr. At 2:23 p.m., April 13, D.P.S. officers, acting pursuant to the intercept order discussed previously, intercepted a telephone call from Chris Castillo to the rural Navarro County residence of his parents, appellants Josephine and Ysidro Castillo Sr. That telephone conversation, which is the focus of this case, led the D.P.S. officers to believe that "there would be something happening the next day ... around noon."

On April 14, D.P.S. officers surveilled the Castillo and Morones residences, located approximately two miles south of Blooming Grove, from the ground and from the air. The Morones residence was across the road from the Castillo residence. At 1:55 p.m. a U–Haul truck left the Morones residence and went to the Castillo residence, where an adult male unloaded three boxes from the truck. At 1:59 p.m. a Dodge van left the Castillo residence and headed south. At approximately 2:10 p.m., a D.P.S. highway patrolman searched the van, which had stopped at a cemetery in Navarro County. The driver of the van was Flavio Quintanilla. The van was found to contain three U–Haul boxes of marihuana, weighing approximately 125 pounds.

Shortly after the van was searched, D.P.S. officers asked for, and received, Jose Morones' consent to search his residence and storage shed. In the storage shed the officers found 37 U–Haul boxes containing marihuana.

In the early evening of April 14, D.P.S. officers executed a search warrant at the Castillo residence. Josephine, Ysidro Sr., and Gilberto Salinas were present when the warrant was executed. Found in and around the residence were: $7,212 in cash in Josephine's purse; $109,000 in cash in the trunk of a Cadillac automobile registered to Josephine; $70,000 in cash buried in a flower bed; $499,000 in cash buried under a doghouse; small amounts of marihuana in a van and workbench drawer in a barn next to the residence; and written notes "that appeared to be drug ledger notes". Also found, in the residence's master bedroom, were numerous notes of unspecified transactions involving many persons and amounts as high as $554,840. Finally, in one of Salinas' pockets were found records of weights which corresponded to the weights of the boxes found in Morones' storage shed.

We have no difficulty concluding that the erroneous admission in evidence of the April 13 conversation was harmless beyond a reasonable doubt as to appellants' convictions. The conversation, when taken in isolation, was not in any way incriminating, and in the context of all the State's evidence, it is quite difficult to see how average jurors could have thought the conversation significant. We also have no difficulty concluding beyond a reasonable doubt that the admission of the conversation did not contribute to the punishments assessed. The conversation did not in any way increase the gravity of appellants' crimes or otherwise place them in a poorer light.

The judgment of the court of appeals is affirmed.

TEAGUE, J., concurs in the result.

CLINTON, J., joins the opinion of the Court on the merits, but would remand the

cause to the Waco Court of Appeals for a harm analysis in the first instance.

STURNS, J., not participating.

### APPENDIX

State's Exhibit No. 10A: Intercepted telephone conversation of April 13, 1987, between Chris Castillo and his parents, Josephine and Ysidro Castillo Sr.

CHRIS: No. But I called a couple of times. Nobody answered.

JOSEPHINE: Well, we were here inside the house. (Inaudible) But it rained so much that it messed up the line or something because when you.... I was trying to call the tax office ...

CHRIS: Ah-ha!

JOSEPHINE: ... and I had just hung up.... 'cause I asked them two ladies for the number and ...

CHRIS: Ah-ha!

JOSEPHINE: ... she give me the number in Waxahachie.

CHRIS: Ah-ha!

JOSEPHINE: And then.... But I hung up the phone, and then I picked it up, and I tried to dial out.... Somebody was on the line.

CHRIS: Ah-ha!

JOSEPHINE: It was Johnny, Carolina's brother.

CHRIS: Who? John?

JOSEPHINE: Ah-ha! He said, "I was having a lot of trouble to get your line." (Pause) (Background noise)

YSIDRO: Hello.

CHRIS: What are you doing, Dad?

YSIDRO: Nothing, son. I just finish arriving from Waxahachie.

CHRIS: Has Curly called you?

YSIDRO: No.

CHRIS: Because he called me this morning.

YSIDRO: Ah-ha.

CHRIS: I've been trying to call over there because he told me that he was going to talk to you.

YSIDRO: Oh.

CHRIS: He told me a person had called.

YSIDRO: Ah-ha.

CHRIS: And that if there was any chance you could help him with one.

YSIDRO: Ah-ha.

CHRIS: And he said, you know, that the job was good.

YSIDRO: Ah-ha.

CHRIS: But if you could help him with one because that was all you need to give him. And he was just telling me.... Ralph just called me a little while ago.

YSIDRO: Uh.

CHRIS: The white boy says, "Yeah!"

YSIDRO: Uh.

CHRIS: You know, he wanted, he wanted to do just one complete job, too.

YSIDRO: Ah-ha!

CHRIS: Just one quick one, you know? And Curly called me, and then I tried to call over there.... (Inaudible) Then the phone just been ringing and ringing. I could never get through.

YSIDRO: No. He'll call after while.

CHRIS: Yeah. (Inaudible) He had told me to try to call, you know. To tell you to call him about noon.

YSIDRO: Yes. But the things are to unload the material. Where will he see? That's why he doesn't want to.

CHRIS: Yeah. But ...

YSIDRO: But....

CHRIS: ... later he said, he said that he, he told us that he would bring a small truck to go over there. Only with the one.

YSIDRO: Uh, I don't think so!

CHRIS: I don't think so, either.

YSIDRO: Ah, no. They go....

CHRIS: But if it works like that, it will be alright. Still.... Because the white boy said that he would come and send everything. All in full. But I, I know he wants to see everything.

YSIDRO: Ah-ha. Me, too! We have to.... We haven't, we haven't done anything here in the ranch now.

CHRIS: Yeah!

YSIDRO: If they want to come with the payment of the light.

CHRIS: Yeah.

YSIDRO: Well, I'm going to wait for Chris to call.... Or that one.

CHRIS: Okay. I going to go over there.

YSIDRO: Good.

CHRIS: (Inaudible) ... well, to talk about what happened yesterday. (Sighs)

YSIDRO: What happened, man?

CHRIS: Oh, nothing much. The, the Puerto Rican that I told you about....

YSIDRO: Ah-ha.

CHRIS: ... El Rick ...

YSIDRO: Ah-ha!

CHRIS: We found him yesterday.

YSIDRO: You found him?

CHRIS: Yeah! Because someone stole his car.

YSIDRO: No, man!

CHRIS: Yes. He had all of the money in the car. That's what he says.

YSIDRO: Oh, that's bullshit.

CHRIS: Yeah. But....

YSIDRO: Did he owe you a lot?

CHRIS: Ha? Do you remember of the 37 feet of pipe?

YSIDRO: Ah-ha!

CHRIS: But two of those.

YSIDRO: And then they didn't pay mine, either?

CHRIS: Ha? Yes. They had already paid yours.

YSIDRO: Oh, that's bullshit! That hardhead.

CHRIS: Yeah! But I found him last night.

YSIDRO: Uh, why didn't he call or anything?

CHRIS: No. That's the thing. He hadn't called because he said he was afraid. Because they stole his car with all of the money in the car.

YSIDRO: That's bullshit. The hardhead.

CHRIS: Yeah! But he showed us where he lived because he never got in touch with us or nothing.

YSIDRO: Uh.

CHRIS: And then finally, finally there last night we found out where. Do you remember Mike?

YSIDRO: Uh-huh!

CHRIS: The white boy?

YSIDRO: Uh-huh!

CHRIS: He got hold of him and everything and met him somewhere, and then when I got out of the truck, he gave up. He left running.

YSIDRO: No, man!

CHRIS: Yes. Then he jumped the fence, and I went after him, and Ralph ... (laughs) ... went in a little car so he couldn't see....

(Gap due to tape change)

CHRIS: I told him, "Let's just sit down and talk," and he kept telling me of how they stole his car and everything.

YSIDRO: That's bullshit. The hardhead.

CHRIS: Well, I'll see you in a little while.

YSIDRO: Okay!

CHRIS: Okay!

YSIDRO: Okay. I'll see you.

CHRIS: Okay. Bye.

McCORMICK, Presiding Judge, dissenting in part and concurring in judgment only.

Article 18.20, Section 3(b), V.A.C.C.P., provides in part that "only the judge of competent jurisdiction for the administrative judicial district in which the proposed interception will be made may act on an application for authorization to intercept wire or oral communications." The critical language regarding the proper judge to issue the intercept order is *"in* which the proposed *interception* will be made." (Emphasis added.) At the time the judge signed the intercept order in this case the term "intercept" was defined as "the aural acquisition of the contents of a wire or oral communication through the use of an electronic, mechanical or other device." 1981 Tex.Sess.Laws 729, ch. 275, sec. 1 (now see Article 18.20, Section 1(3), V.A.C.C.P.). Substituting the definition of "intercept" for the word "interception" in Section 3(b) that section provides that only the judge *"in"* the district where the *"contents"* of the communication will be *"aural[ly] acqui[red]"* (i.e. heard) is authorized to issue the order. No other meaning is discernable.

Indeed, most case law construing the federal counterpart[1] to our wiretapping

1. See Title III of the Omnibus Crime Control and Safe Streets Act codified as 18 U.S.C.

statute interprets the term "aural acquisition"—as it relates to which judge has authorization to issue intercept orders—to mean where the communication is actually heard or where it is recorded. For example, in *Evans v. State*, 252 Ga. 312, 314 S.E.2d 421, cert. denied, 469 U.S. 826, 105 S.Ct. 106, 83 L.Ed.2d 50 (1984), the Fulton County Superior Court judge authorized several wiretaps. Some of these taps were located outside of Fulton County. The calls, however, were all monitored by a surveillance team in Fulton County. Defendants argued that the judge lacked jurisdiction to authorize wiretaps on telephones located outside of Fulton County. The Georgia Supreme Court, interpreting and applying Title III of the Omnibus Crime Control and Safe Streets Act, determined that the "aural acquisition" occurred where authorities heard the conversations. Specifically, the Court determined: "It is undisputed that the only oral aural acquisition of the defendant's communication occurred in the Atlanta Judicial Circuit (Fulton County) where the judge authorizing the investigative warrants was sitting. We therefore find that federal law authorized issuance of these warrants by the Fulton Superior Court judge." 314 S.E.2d at 426.

Thereafter, the defendants in *Evans* filed a habeas corpus petition in federal court, again arguing that the Fulton County judge lacked jurisdiction to authorize the wire taps. The Federal District Court rejected the arguments, holding that the location of the "listening post" determined which judge was authorized by the statute to issue the warrants. The district court concluded that the "interceptions ... occurred *not* where the tapped telephone calls were mechanically interfered with (something which occurred with respect to twenty-three telephones located outside of Fulton County, as well as eighteen tele-

phones located in Fulton County) but *where the contents of the telephone calls—the conversations—were heard or aurally acquired.*" *Adams v. Stynchcombe*, Cause No. C84–2312A, slip op. at pp. 8–10, (N.D. Ga., delivered March 5, 1985)[2] (emphasis in the original) *affirmed on other grounds sub nom.*, *Adams v. Lankford*, 788 F.2d 1493 (11th Cir.1986).

The same conclusions made by the Georgia Supreme Court and the District Court for the Northern District of Georgia were made by the District Court for the Southern District of New York. Adding to the rationale employed in the Georgia cases, the New York District Court reasoned:

"The logic of the [Georgia] cases is illustrated by a comparison with pen registers. For the very reason that a pen register does not hear sound and therefore does not accomplish an 'interception' of wire communications as that term is defined by 18 U.S.C. § 2510(4), the use of pen registers as a device to monitor and record the numbers dialed from a particular telephone was not governed by Title III. See *United States v. New York Telephone Co.*, 434 U.S. 159, 165–67, 98 S.Ct. 364 [368–70], 54 L.Ed.2d 376 (1977). It is the capacity of the wiretap to hear and to disclose the contents (the Court emphasized 'the *aural* acquisition of the *contents*', id. at 166 [369] (italics in the original)) of the communication which brought it under Title III, and which supports the logic of recognizing the jurisdiction of the court at the place where the wiretap is overheard or monitored." *United States v. Rodriguez*, 734 F.Supp. 116, 121 (S.D.N.Y.1990).

See also *Michigan Bell Telephone Co. v. United States*, 565 F.2d 385, 388 (6th Cir. 1977) and the cases cited therein.

The only case contrary to the above cited cases is *United States v. Nelson*, 837 F.2d

---

§§ 2510–2521. It is a generally accepted rule of statutory construction that when the Legislature adopts a "foreign" statute it also adopts the construction of that statute by the foreign jurisdiction occurring prior to the Texas enactment. *Hansen v. Blackmon*, 169 S.W.2d 955, 958 (Tex. Civ.App.1943); *State v. Klein*, 154 Tex.Crim. 31, 224 S.W.2d 250, 253 (1949).

**2.** The District Court's opinion was not published. Most of the opinion, however, is reproduced in *United States v. Rodriguez*, 734 F.Supp. 116 (S.D.N.Y.1990) which adopted the *Adams'* holding.

1519 (11th Cir.) cert. denied, 488 U.S. 829, 109 S.Ct. 82, 102 L.Ed.2d 58 (1988) (a case decided after enactment of the Texas Statute and after the intercept order was signed in this case). The majority's reliance upon *Nelson*, however, is extremely questionable.

In *Nelson* the court was concerned with the same issue that is before us; however, unlike the State in the case before us, the government there argued that "interception" referred to the acquisition of a communication as well as the "initial acquisition by a [recording] device and the *hearing* of the communication by the person or persons responsible for the recording." The panel of judges in *Nelson* agreed with the government's arguments and held that "the term 'intercept' as it relates to 'aural acquisitions' refers to the place where a communication is initially obtained regardless of where the communication is ultimately heard." 837 F.2d at 1527. It is clear, however, that the language relied upon by the government was taken out of context from *United States v. Turk*, 526 F.2d 654, 658 (5th Cir.1976) cert. denied, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976). Moreover, the language utilized by the government was contrary to other observations made by the *Turk* court.

The issue in *Turk* was whether "action of the officers in listening to the cassette tape seized from [a third party's] car constituted an impermissible 'interception' of Turk's oral communication, as defined in 18 U.S.C. § 2510(4)." *Turk*, 526 F.2d at 657. The *Turk* court held that the initial recording of the conversation was an "interception" but that this initial interception was not violative of Title III since one of the parties to the conversation had consented to the recording. 526 F.2d at 657 citing 18 U.S.C. § 2511(2)(d). Thus, the only issue was whether each *replaying* of a *prior* recording constituted an "interception" as

defined in Title III. The *Turk* court determined that each replaying was not an interception because "'aural acquisition' is accomplished only when two steps are completed—the initial acquisition by the device and the hearing of the communication by the person or persons responsible." 526 F.2d at 658. In short, the *Turk* opinion determined that Title III envisioned a "contemporaneous acquisition" of the communication and, as such, each replaying of the prior recording was not violative of the Act. See *Id.* The court in no way sought to determine which judge could issue intercept orders. More importantly, the *Turk* Court wrote (and the *Nelson* court ignored) the following:

"We believe that a[n] ... interpretation ... which would exclude from the definition of 'intercept' the replaying of a previously recorded conversation has a much firmer basis in the language of § 2510(4) and in logic, and corresponds with the legislative history. The words 'acquisition ... through the use of any device' suggests that the central concern is with the activity engaged in at the time of the oral communication which causes such communication to be overheard by uninvited listeners. If a person secrets a recorder in a room and thereby records a conversation between two others, *an 'acquisition' occurs at the time the recording is made.*" 526 F.2d at 658 (emphasis added).

Thus, accepting *Turk* as a legal basis for its holding, the *Nelson* court was wrong—not only did the opinion take language out of context, it ignored other language clearly contrary to its holding contained within the *Turk* opinion.[3] By merely accepting *Nelson* as legal basis for its holding today, the majority in the case before us, perpetuates the wrongs made in *Nelson*.

Considering the costs involved in wiretapping, see Dix, *Texas Electronic Surveillance*, 7 Thur. Marshall L.R. 105 (1981), it

---

3. It is obvious that the *Nelson* panel was not completely satisfied with this holding since it additionally supported affirmance of the conviction on a determination that the defendant's claims "did not implicate Congress's core concerns in passing Title III." *Nelson*, 837 F.2d at

1527, citing *Adams v. Lankford*, 788 F.2d 1493, 1498–90 (11th Cir.1986). (A strange holding since *Adams* involved whether an issue was cognizable in federal habeas review and *Nelson* involved the same issue in the case before us.)

is expected that electronic surveillance will occur in only limited, large scale operations where these operations would be most likely to cross district boundaries. It appears that the central concern of the Legislature in establishing territorial restrictions was to centralize law enforcement. See *United States v. Chavez*, 416 U.S. 562, 571–575, 94 S.Ct. 1849, 1854–56, 40 L.Ed.2d 380 (1974); *Adams v. Lankford*, 788 F.2d 1493, 1499 (11th Cir.1986). Today the majority thwarts that purpose by mandating that in those cases where wiretapping crosses district lines other law enforcement personnel along with other judges must be made a part of the operations. See and cf., *Adams v. Lankford*, 788 F.2d at 1499. The majority rejects the obvious legislative intent and purpose (along with the better reasoned case law and the plain meaning of the statute) because, taking into account that a listening post can be established anywhere in the State, "law enforcement officials would be free to 'shop' for a sympathetic judge from which to obtain an intercept order." 810 S.W.2d at 184. In other words, the majority rejects a common sense reading of the Texas statute and the legislative goal of centralization because it believes Texas law enforcement personnel would be apt to forum shop. Because I am unwilling to imply bad faith on the part of Texas law enforcement officials, I am unable to accept the majority's only justification to reject the Legislature's clear intent to place authority for issuance of the intercept order in the judge *"in"* the district where the *"contents"* of the communication will be *"aural[ly] acqui[red]."* [4]

In summary, I agree with the holdings of the Georgia and New York cases, along with the Waco Court of Appeals' opinion in this case. The holdings in these cases are aptly supported by better reasoning and sounder logic than that employed by the

majority in the case before us. Consequently, I dissent to the majority's holding that the judge located in the district where the listening device is to be attached is authorized to issue the intercept order under Article 18.20, Section 3(b), V.A.C.C.P.

I concur only in the judgment to affirm the convictions.

---

**4.** It is incredible that the majority attempts to justify its conclusions by reference to the Bill Analysis. The Bill Analysis to Article 18.20, V.A.C.C.P., states that the purpose of Section 3(b) is to "provide for the designation by the presiding judge of the court of Criminal Appeals of one district from each judicial district to hear applications for *electronic surveillance within* *that district."* (Emphasis added.) Considering that "surveillance" is a "watching over," see *Random House Dictionary*, p. 1916 (2nd Ed. 1987); *Webster's Third International Dictionary*, p. 2302 (1969), clearly then, the Legislature intended that the issuing judge be the one *"within the district"* where authorities would be "watching over" or listening to the conversations.