No. 69,980

STATE OF KANSAS, *Appellant*, v. BRANDON KELLY GIBSON,
*Appellee.*
(874 P.2d 1122)

Opinion filed May 27, 1994.

*Gabrielle M. Thompson*, assistant county attorney, argued the cause, and *Robert T. Stephan*, attorney general, was with her on the brief for appellant.

*Troy V. Huser*, of Myers, Pottroff & Ball, of Manhattan, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: The State of Kansas appeals from the district court's order dismissing criminal charges against the defendant, Brandon Kelly Gibson. The district court suppressed all the evidence obtained by pen register and wiretaps and, upon the State's advising the court that there "was no evidence without this," dismissed the charges against the defendant. The State appeals pursuant to K.S.A. 1993 Supp. 22-3602(b)(1).

The State raises two issues on appeal:

1. Does a district judge sitting in one judicial district have power to authorize installation and use of a pen register which

has the "slave unit" physically located in another judicial district if the decoding and recording unit is located in the judge's judicial district and monitoring takes place there?

2. Did the district court err in dismissing the counts which allege that defendant used a telephone to arrange the sale or purchase of controlled substances in violation of K.S.A. 65-4141 on the ground that it is an offense "other than those specified in the order authorizing" the wiretap within the meaning of K.S.A. 1993 Supp. 22-2515(f).

On May 7, 1992, the Honorable Paul E. Miller, Judge of the District Court of Riley County, upon the application of the Assistant Riley County Attorney, signed and filed an order authorizing the following in the criminal investigation of Gibson and John Delbane:

(a) The Riley County Police Department may install and use a pen register dial recorder to register numbers calling to and called from 913/539-1861, which corresponds to the physical address of 5617 Elbo Bluff Drive, Manhattan, Pottawatomie County;

(b) the authorization to trap and trace calls is limited to the geographic limits of the jurisdiction of Southwestern Bell Telephone in Riley County;

(c) the purpose of the investigation was to gather information about the unlawful sale of controlled substances; and

(d) the authorization would expire in 30 days.

On May 8, 1992, the order was amended so that the authorization to trap and trace calls was "limited to the geographic limits of the jurisdiction of Southwestern Bell Telephone in Riley and Pottawatomie Counties." The order states: "The trap/trace device is a two part component. One part will be in rural Pottawatomie County attached to Southwestern Bell's telephone services and the second part is located in Riley County. The monitoring is located in Manhattan, Riley County, Kansas."

On May 12, 1992, a similar authorization was obtained from Judge Miller for 913/539-6325, which also corresponds to the physical address of 5617 Elbo Bluff Drive. It, too, authorizes a two-part trap/trace device to be located in Pottawatomie and Riley Counties with the monitoring in Riley County.

On July 7, 1992, a joint application for authorization to intercept and record wire communications was made to Justice Lockett by the county attorneys of Riley and Pottawatomie Counties. The State concedes that the application was "based in part on the information obtained from the pen registers." In addition to the two telephone lines at 5617 Elbo Bluff Drive to which the pen register devices had been connected, the order authorizing interception applies to 913/539-8845 located at 410 S. Juliette, Manhattan, Riley County. The application and the order of Justice Lockett specify that the type of telephone communications sought concern "sale and possession with intent to sell cocaine as defined by K.S.A. 65-4127a and sale and possession with intent to sell marijuana/tetrahydrocannabinol as defined by K.S.A. 65-4127b and the offenses of conspiracy to commit the above listed offenses as defined by K.S.A. 21-3302."

In August 1992, a 10-count complaint was filed in Riley County District Court against Gibson. Each odd-numbered count alleged conspiracy to sell controlled substances, contrary to K.S.A. 21-3302, K.S.A. 65-4127a, and K.S.A. 65-4107b. Each even-numbered count alleged use of a telephone to facilitate violation of K.S.A. 65-4127a and 65-4107b, contrary to K.S.A. 65-4141. Counts I and II are based on a telephone call made on a cordless telephone on June 11, 1992. The cordless telephone call was overheard and recorded by law enforcement officers without the use of equipment which requires judicial authorization. Counts III through X are based on telephone calls which were intercepted pursuant to Justice Lockett's order. An amended information filed in February 1993 retains this organization.

Gibson filed a motion to suppress the evidence obtained through the pen registers and the wiretaps. He contended that the pen registers were unlawful because component parts were located in Pottawatomie County and the authorizations had been issued by a Riley County district judge. He contended that the evidence obtained through the wiretaps should be suppressed as fruit of the poisonous tree. Gibson also sought dismissal of certain counts for failure to specify the offenses alleged in those counts in the application for a wiretap order. On May 25, 1993, Judge

Miller ordered that all evidence relating to the charges be suppressed and that all charges filed against the defendant be dismissed. The dismissal was based on K.S.A. 22-2515(6) and *State v. Kuchinsky*, 3 Kan. App. 2d 224, 592 P.2d 144 (1979). In the order dismissing Counts IV, VI, VIII, and X, the district court stated: "At no time were violations of K.S.A. 65-[4141] specifically brought to the attention of Justice Lockett, nor was any subsequent application made to him to include evidence of those crimes at any time, let alone as soon as practicable." In a separate journal entry, the district court explained its rationale for suppressing the evidence relating to all of the counts. The district court stated:

"1. A pen register device is comprised of two components. One component being the Bartec monitoring device and the second component being what is referred to by the manufacturer as a 'slave device.'

"2. The pen register system, as used in this case, required both components to intercept defendant's telephone transmissions.

"3. The monitoring device was located at Riley County Police Department, Special Investigations Unit Headquarters located in Riley County, Kansas.

"4. The slave device necessary for interception was located in Pottawatomie County.

"5. The Court finds for the reasons set forth in the record that it had no jurisdiction to issue an order authorizing a pen register unit, any part of which is outside of the court's judicial district.

"IT IS THEREFORE ORDERED, ADJUDGED AND DECREED, that because the Court acted outside its jurisdiction in issuing its order authorizing pen register interception of defendant's telephone transmissions, that all evidence obtained by the State from and after the initial order authorizing pen register interception of defendant's phone transmissions dated May 7, 1992, should be and is hereby suppressed."

On June 18, 1993, the State filed a Notice of Appeal from the orders dismissing Counts IV, VI, VIII, and X and suppressing evidence obtained through use of a pen register and wiretap.

We first consider if Judge Miller had jurisdiction to authorize installation and use of a pen register. This question arises because Judge Miller of the Riley County District Court authorized installation and use of pen register devices on Pottawatomie County telephones. The bulk of the equipment and all monitoring were in Riley County, but one component of the equipment was lo-

cated in Pottawatomie County. Riley County is in the Twenty-first Judicial District. K.S.A. 4-222. Pottawatomie County is in the Second Judicial District. K.S.A. 4-203.

Neither party contends that there are any Kansas cases which directly answer this question. Neither party suggests what the appellate standard of review ought to be. The State relies primarily on federal cases and cites two Kansas cases for the proposition that federal case law is treated as controlling where wiretap statutes are at issue. The only Kansas case discussed by the State is *State v. Adams*, 2 Kan. App. 2d 135, 576 P.2d 242, *rev. denied* 225 Kan. 845 (1978), and the point of that discussion is to distinguish *Adams* from the present case.

In *Adams,* the district attorney of Johnson County applied to a judge of the Tenth Judicial District for authorization to intercept and record telephone communications on a telephone located in Wyandotte County in the Twenty-ninth Judicial District. "The telephone, the interception bridge, and the monitoring station" all were located in Wyandotte County. 2 Kan. App. 2d 135. The Court of Appeals affirmed the district court's suppression of evidence obtained by the wiretap which had been authorized by the Johnson County judge. 2 Kan. App. 2d at 136.

With regard to this court's view, the Court of Appeals stated:

"However, the Supreme Court has tended to narrowly construe the statutes governing electronic eavesdropping and has required strict compliance with their terms. *In re Olander,* 213 Kan. 282, 515 P.2d 1211 (1973); *State v. Farha,* 218 Kan. 394, 544 P.2d 341 (1975); *State v. Dowdy,* 222 Kan. 118, 563 P.2d 425 (1977). The court has noted that '[n]o area of the law is more sensitive than that of electronic surveillance, since such activity intrudes into the very heart of personal privacy. . . .' *In re Olander, supra,* p. 285." 2 Kan. App. 2d at 138.

The Court of Appeals formulated the following rule:

"Where there is interception of telephonic communications, and the locations of the telephone as to which the intercept is conducted, the intercepting device and the monitoring are within the same judicial district, a district judge sitting in another judicial district has no power under K.S.A. 1976 (now 1977) Supp. 22-2516(3) to authorize the interception." 2 Kan. App. 2d at 138.

The Court of Appeals relied on the language of K.S.A. 1976 Supp. 22-2516(3), K.S.A. 1976 Supp. 20-301a, and Article 3, § 6 of the Kansas Constitution, stating:

"Pursuant to the statute, a district judge may authorize the interception of wire or oral communications within his 'territorial jurisdiction.' The statute gives no authority to a district judge, and he has none, to grant orders for the interception of wire or oral communications outside his 'territorial jurisdiction.' We conclude that the 'territorial jurisdiction' of [the judge who issued the order], for the purpose of authorizing the interception of wire or oral communications under K.S.A. 1976 (now 1977) Supp. 22-2516(3), was the Tenth Judicial District.

"The territorial limit of the jurisdiction of state courts is defined by state statutes and constitutional provisions. *In re Jewett*, 69 Kan. 830, Syl. ¶ 3, 77 Pac. 567 (1904). The jurisdiction of a court may be territorially limited by constitutional or statutory provisions to a part of the territory of the sovereignty to which it belongs. 20 Am. Jur. 2d, Courts, § 153, p. 499. Our district courts have only such jurisdiction as may be provided by the legislature. *City of McPherson v. State Corporation Commission*, 174 Kan. 407, 411, 257 P.2d 123 (1953).

"Article 3, § 6, of the Kansas Constitution (K.S.A. 1977 Supp.) provides as follows:

'§ 6. **District courts.** (*a*) The state shall be divided into judicial districts as provided by law. Each judicial district shall have at least one district judge. . . .

'(b) The district court shall have such jurisdiction in their respective districts as may be provided by law.'

"K.S.A. 1976 (now 1977) Supp. 20-301a provides as follows:

'**Classes of judges of the district court**. There shall be three classes of judges of the district courts established pursuant to K.S.A. 1976 Supp. 20-301; District judges, associate district judges and district magistrate judges; and as used in this act, the term "judge of the district court" shall mean any of such judges. Such judges shall have the jurisdiction, powers and duties prescribed by this act and otherwise prescribed by law. *The judicial power and authority of a judge of the district court in each judicial district may be exercised anywhere within such judicial district,* and may be exercised anywhere within any other judicial district when assigned to hear any proceeding or try any cause in such judicial district, as provided in K.S.A. 1976 Supp. 20-319.' (Emphasis supplied.)

"By statute, Johnson County constitutes the Tenth Judicial District (K.S.A. 1976 [now 1977] Supp. 4-211) and Wyandotte County constitutes the Twenty-ninth Judicial District (K.S.A. 1976 [now 1977] Supp. 4-230).

"We believe the term 'territorial jurisdiction' as used in K.S.A. 1976 (now 1977) Supp. 22-2516(3), when applied to a district judge and when considered in light of Article 3, § 6 and K.S.A. 20-301a, means the judicial district within which the district judge sits." 2 Kan. App. 2d at 136-37.

The State would have this court disregard *Adams* on the ground that *all* equipment and monitoring were in one judicial district and the judge who authorized the activity was in another. Gibson points out that "[t]he *Adams* court was dealing with a wire tap order and not a pen register order."

In layman's terms, a wiretap involves voice communications being heard and recorded; a pen register deciphers numbers being dialed. The statutory definitions pertinent to a wiretap state:

" '[I]ntercept' means the aural or other acquisition of the contents of any wire, oral or electronic communication through the use of any electronic, mechanical or other device." K.S.A. 22-2514(3).

" '[C]ontents' when used with respect to any wire, oral or electronic communication, includes any information concerning the substance, purport or meaning of such communication." K.S.A. 22-2514(6).

" '[A]ural transfer' means a transfer containing the human voice at any point between and including the point of origin and the point of reception." K.S.A. 22-2514(17).

The statutory definitions pertinent to a pen register state:

"As used in K.S.A. 22-2522 through 22-2529:

. . . .

"(2) 'pen register' means a device which records or decodes electronic or other impulses which identify the numbers dialed or otherwise transmitted on the telephone line to which such device is attached . . . .

"(3) 'trap and trace device' means a device which captures the incoming electronic or other impulses which identify the originating number of an instrument or device from which a wire or electronic communication was transmitted." K.S.A. 22-2529(2) and (3).

The scheme described in the wiretap provisions is more elaborate than that for pen registers. K.S.A. 22-2514 defines 17 terms used in the statutory provisions for the authorized interception of wire, oral, or electronic communications. K.S.A. 1993 Supp. 22-2515 limits applications for authorization to investigations of certain serious crimes and provides for the use and disclosure of the contents of intercepted communications. K.S.A. 22-2516 prescribes the form and contents of the application, issuance of an order, its contents, progress reports, recording of intercepted communications, post-interception notice to persons named in the order, evidentiary status of intercepted communications, grounds for a motion to suppress, and the State's right to appeal an order denying authorization or suppressing evidence. K.S.A. 22-2517 prohibits the receiving into evidence of unlawfully intercepted

wire or oral communications. K.S.A. 22-2518 establishes a civil cause of action for damages for any person whose wire, oral, or electronic communications have been unlawfully intercepted. K.S.A. 22-2519 requires judges who have authorized interceptions and prosecutors to file reports on the interception of wire, oral, and electronic communications to the administrative office of the United States courts.

A comparison of the contents of the sections dealing with pen registers and the sections dealing with wiretaps reveals that the legislature drew a fairly sharp distinction between the two investigative tools. The initial provisions governing them were enacted at separate times. The pen register and wiretap provisions are discrete and even contain their own definition sections. The maximum duration of a wiretap order is 30 days, and for a pen register it is 60 days. K.S.A. 22-2516(5); K.S.A. 22-2527(3)(a). The lesser degree of invasion involved in the use of a pen register also is reflected by the substantially fewer requirements and restrictions contained in the pen register provisions. Thus, as a general matter, it would not seem that case law interpreting a wiretap provision need be considered controlling authority in the interpretation of a pen register provision.

In the particular instance of the authority of a judge to authorize use of wiretaps and pen registers, there is, in addition to all the schematic differences noted above, a difference in the words chosen by the legislature. K.S.A. 22-2516(1) provides that "[e]ach application for an order authorizing the interception of a wire, oral or electronic communication shall be made in writing . . . to a judge of competent jurisdiction." K.S.A. 22-2514(8) states that " 'judge of competent jurisdiction' means a justice of the supreme court, a judge of the court of appeals or any district judge but does not include a district magistrate judge." K.S.A. 22-2516(3), the provision construed by the Court of Appeals in *Adams*, provides that upon application, "the judge may enter an *ex parte* order . . . authorizing the interception of wire, oral or electronic communications within the territorial jurisdiction of such judge." In contrast, K.S.A. 22-2526 provides that an application for an order authorizing a pen register may be made to

"a court of competent jurisdiction." K.S.A. 22-2529(1) states that a " '[c]ourt of competent jurisdiction' means a district court or appellate court." K.S.A. 22-2527 provides that upon application, "the court shall enter an *ex parte* order authorizing the installation and use of a pen register or a trap and trace device within the jurisdiction of the court." Jurisdiction of the court is not defined in the pen register provisions.

Gibson suggests that the court look to K.S.A. 20-301a, which was quoted in a portion of the *Adams* opinion quoted above, for the definition of jurisdiction of the court. K.S.A. 20-319(b), which is referenced in 20-301a, provides:

> "Departmental justices shall have authority within their departments to assign any district judge or district magistrate judge to hear any proceeding or try any cause, within the judge's jurisdiction, in other district courts. Any departmental justice may request the assistance of any district judge or district magistrate judge from another department."

The Second and Twenty-first Judicial Districts are within the same judicial department. Supreme Court Rule 1.03(e) (1993 Kan. Ct. R. Annot. 2). Thus, there is no absolute constraint on a district court judge's extraterritorial functioning.

The federal cases relied on by the State are *U.S. v. Burford,* 755 F. Supp. 607 (S.D.N.Y. 1991), and *U.S. v. Rodriguez,* 734 F. Supp. 116 (S.D.N.Y. 1990), *cert. denied* ___ U.S. ___, 121 L. Ed. 2d 92 (1992). In *Burford,* there were motions to suppress evidence obtained by both pen registers and wiretaps. The wiretap authorization was issued by a judge in the Southern District of New York for a telephone located in Maryland. 755 F. Supp. at 610. Construing 18 U.S.C. § 2518(3) (Supp. IV 1992), which includes the "territorial jurisdiction" language used in K.S.A. 22-2516(3), the court concluded that "[f]or jurisdictional purposes the question is where the interception occurred." Here is the court's analysis:

> "The term '[i]ntercept', as defined in the statute, does not require the eavesdropper or issuer of the wiretap order to be located in the same jurisdiction as the tapped line. Since the information was actually heard in a wire room in New York through the use of a 'slave' device, the interception occurred in this jurisdiction." 755 F. Supp. at 610.

The court rejected the defendant's argument "that the determinative question is where the slave device is located." 755 F. Supp. at 611.

With regard to the pen registers, the defendant "in essence, advance[d] the same jurisdictional arguments against the government's use of pen registers as those urged to suppress information obtained from the wiretaps." 755 F. Supp. at 611. The controlling statute, 18 U.S.C. § 3123 (Supp. IV 1992), corresponds to K.S.A. 22-2527(1) in allowing a court to authorize installation and use of a pen register "within the jurisdiction of the court." The federal court stated: "Unlike the wire tapping statute, where significant issues of privacy are at stake, this law is 'intended merely to safeguard against purely random use of this device.' *United States v. Hallmark*, 911 F.2d 399, 402 (10th Cir. 1990)." 755 F. Supp. at 611. The telephone that was monitored by the pen register in question was located in Maryland, but the pen register device was physically located in New York. 755 F. Supp. at 611. Because it was " 'installed and used' " in New York, there was no jurisdictional defect. 755 F. Supp. at 611.

In *Rodriguez*, there were challenges to the evidence obtained by wiretaps and pen registers authorized by a federal judge in New York for telephones in New Jersey. The pen register issue, however, involved the authority of a magistrate and is of no relevance in the present case. 734 F. Supp. 123-24. In a footnote, the court defined a pen register as "a device that records the telephone numbers dialed from a particular telephone. However, it does not overhear the communication and does not indicate whether calls are actually completed. *See U.S. v. New York Tel. Co.*, 434 U.S. 159, 161 n.1, 98 S. Ct. 364, 366-67 n.1, 54 L. Ed. 2d 376 (1977)." 734 F. Supp. at 118-19 n.3.

On the basis of the "interception" analysis, which later was adopted in *Burford*, the court rejected defendants' argument that a judge sitting in the Southern District of New York had no jurisdiction to authorize the wiretaps of telephones in New Jersey. 734 F. Supp. at 120-21. The court examined *Evans v. State*, 252 Ga. 312, 314 S.E.2d 421, *cert. denied* 469 U.S. 826 (1984), which is cited by the State in the present case, and found its reasoning

persuasive. 734 F. Supp. at 120. It also approved the reasoning of *Castillo v. State*, 761 S.W.2d 495 (Tex. App. 1988), *aff'd* 810 S.W.2d 180 (Tex. Crim. App. 1990). 734 F. Supp. at 121. Commenting on the state court cases, the federal court stated:

"The logic of these cases is illustrated by a comparison with pen registers. For the very reason that a pen register does not hear sound and therefore does not accomplish an 'interception' of wire communications as that term is defined by 18 U.S.C. § 2510(4), the use of pen registers as a device to monitor and record the numbers dialed from a particular telephone was not governed by Title III [of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510-21 (Supp. IV 1992)]. *See United States v. New York Telephone Co.*, 434 U.S. 159, 165-67, 98 S. Ct. 364, 368-70, 54 L. Ed. 2d 376 (1977). It is the capacity of the wiretap to hear and to disclose the contents (the Court emphasized 'the *aural* acquisition of the *contents*', *id.* at 166, 98 S. Ct. at 369 (italics in original) of the communication which brought it under Title III, and which supports the logic of recognizing the jurisdiction of the court at the place where the wiretap is overheard and monitored." 734 F. Supp. at 121.

In the present case, the district court found that the pen register had two components, the monitoring device and the slave unit; that both were necessary for the enterprise; and that the slave unit was located in Pottawatomie County. The State argues that the district court's finding that the pen register is a two-part device, one part of which is the slave unit, "is contrary to the statutory definition of a pen register, the functional operation of a pen register and the rulings of federal courts in strictly analogous cases." We agree.

The district court conducted a hearing on Gibson's motion to suppress at which several State witnesses described the equipment. First Southwestern Bell Telephone Company's liaison with law enforcement on "court matters such as this," David Vogel, testified about the telephone company's involvement, the equipment, and its installation. According to Vogel, the terms "sack box" and "appearance point" refer to the green boxes one sees at intervals along the road which contain telephone company equipment and are the points where buried cable is brought above ground for accessibility. He described the slave unit used in this case as a "dial-up slave unit." Asked to explain how it works, he testified that it connects the target line and the law

enforcement line, thus allowing the pen register to be operated from a remote location. Without the slave unit, the pen register would have to be operated at an appearance point of the target line. Thus, it appears from Vogel's testimony that the slave unit contributes to the success of a surveillance operation by concealing it, but it is not indispensable. On redirect examination, the following questions were asked and answered:

"Q. Then the slave unit is not actually an intrinsic part of the pen register?

"A. No. The pen register can be operated—it does not require a slave unit to operate a pen register. It's a choice. It's a bridging device that is—was just a choice of, in this particular case, of law enforcement.

"Q. Then would you call it an accessory?

"A. Yes."

Vogel was asked a number of questions with respect to why the slave unit was placed in Pottawatomie County at an appearance point near Gibson's residence rather than at an appearance point in Riley County. He testified that each telephone line consists of a pair of wires which originates in the central office and terminates at the customer's location, in this case a residence. Between the central office and the residence there might be one or many appearance points. The slave unit may be attached at any appearance point, as long as the appearance point has available vacant pairs of wires. In any case, the appearance points are more likely to be "out in that area where the cable serves the customers" than close to the central office. Vogel testified:

"Q. . . . So if there were an appearance point a block away from Riley County Police Department it wouldn't necessarily be a usable one if there were not empty pairs that could be used?

"A. Yeah. If we didn't have vacant pairs we couldn't—we wouldn't be able to use it.

"Q. But even without—

"A. There was not in this particular case. There—there was not any appearance point near Riley County.

"Q. I see.

"A. Near the police department."

It does not appear that this testimony could be interpreted to mean that there were no available appearance points in Riley County. He testified that as a general rule, where more than one

appearance point is available, law enforcement officials would choose to be as far away from the location of the targeted telephone as possible in order to diminish the chance of the installation's being observed.

From the Kansas Bureau of Investigation, the State called as a witness Douglas Jorgensen, who described himself as "the technical support unit." He explained that the type of pen register used by the Bureau is manufactured by the Bartec Corporation. It is an electronic unit with a small built-in computer, two attachments for telephone lines, and audio ports. He testified: "We use the same pen register whether we're doing just a standard pen or for—if we're doing an actual oral intercept. When we do the oral intercept we just use the same machine except we attach a couple of recorders to it with patch cords." Jorgensen described the pen register as a decoder which prints out the date and time of each incoming and outgoing call on the target line. It also prints out the numbers dialed on outgoing calls. He corroborated Vogel's testimony about the function of the slave unit and confirmed that it does no decoding. When asked whether "the intercept occurs" at the slave unit, Jorgensen stated:

"The information actually is intercepted at the pen register because all that slave does is connect us to the target line and let the information flow to us like an extension would. So the actual information is actually intercepted and decoded here at the pen register. None of those functions are done at the slave."

He added that the slave unit acts as a buffer between the target line and the law enforcement line to prevent any short or static on the law enforcement line from interfering with service on the target line. This feature contributes to concealment of the surveillance.

Alan Riniker, a Riley County Police Detective, testified that he installed the devices used pursuant to the Riley County district judge's order. He installed the Bartec unit at the Riley County Police Department Investigations Division. The slave units for both targeted telephone lines were installed at a sack box in the vicinity of 9900 East 24 Highway, in Pottawatomie County. He testified that he installed them there because that appearance point was farthest from 5617 Elbo Bluff Drive among those the

telephone company told him about. Like Jorgensen, he testified that the pen register, the Bartec unit, does not decode the telephone number from which incoming calls are made. That information, the trap and trace information, must be obtained through the telephone company.

Based upon this testimony, the district court found that the pen register system, as used in this case, *required* both the Bartec and the slave units to intercept Gibson's telephone transmissions. Based upon that finding, the district court concluded "that it had no jurisdiction to issue an order authorizing a pen register unit, any part of which is outside of the court's judicial district." Because the conclusion is broader than the finding, each will be discussed separately.

Although not argued by the State, the finding of the district court was not supported by the evidence. There was testimony, which directly contradicted the finding of the district court, that the Bartec pen register can be used without a slave unit. There was testimony that the slave unit made the task of monitoring more convenient because it could be done at police headquarters instead of at the sack box. There also was testimony that the slave unit helped ensure the secrecy of the surveillance for the same reason. There was no testimony, however, that a slave unit was indispensable to operation of the pen register system or that it was part of the pen register. In this regard, Detective Riniker testified:

"Q. Why was that particular appearance point selected?

"A. That appearance point was the only known one between the central switching office, which is located at 17th and Fairchild, and within the neighborhood of the defendant's. It's the first appearance that we would have capability of installating (sic) the equipment without being observed or detected or questioned.

"Q. Okay. You said it was the only—it was the only known appearance point. Since that date have you learned of any other point—any other appearance point where those wires are accessible?

"A. No. Other than from that address on up to the defendant's home. There are other appearance points, but this one is the main unit.

"Q. Is there any appearance point for those lines between the central telephone office on Fairchild Street in Manhattan and the appearance point at 9900 East Highway 24?

"A. Not that I've ever been made aware of by the phone company.

"Q. That's the only one you were able—they gave you?

"A. That's correct."

If, in fact, the only appearance points available for attachment of the slave unit were in Pottawatomie County, it also would be true that monitoring at the sack box, which is one of the alternatives to using a slave unit, would have to occur in Pottawatomie County. Riniker's testimony, however, is not that there were no available appearance points in Riley County but, rather, that he had not been made aware of any. Moreover, if a slave unit is not used, monitoring may occur at a remote location using a "lease line." Jorgensen testified that although the KBI no longer uses lease lines due to the expense and waiting period for installation, the KBI previously used them and the FBI still does. When a lease line is used, the telephone company "engineers" two wires which run from the appearance point to the listening post.

The district court concluded that it had no power to authorize installation and use of a pen register unit when any part, not just any indispensable part, of it would be outside the judicial district. As discussed above, the State relies on wiretap cases which permit surveillance on telephones located outside the judicial district as long as the "interception" takes place within it. The rationale of those cases is built on the definitions of intercept, contents, and aural acquisition. Because a pen register does not involve eavesdropping on substantive voice communications, there is no actual application of those definitions in the present circumstances. The State, however, urges the court to analogize the interception of voice communications in the wiretap cases to the decoding of the electronic impulses into numbers dialed. In each instance, monitoring took place at law enforcement headquarters. Hence, procurement of information in a form useful for investigative or evidentiary purposes occurred there. For this reason, even though the federal court in *Rodriguez* illustrated the logic of the interception analysis of the Georgia and Texas wiretap cases by contrasting the functions of wiretaps and pen registers, 734 F. Supp. at 121, a similar analysis based on the monitoring location seems appropriate in the present pen register case.

As previously indicated, the court in *Rodriguez* found *Evans* to be persuasive. *Evans* is an appeal from convictions under Georgia's RICO scheme for operation of a gambling ring in the metropolitan Atlanta area. On appeal, the defendants argued that the trial court should have suppressed evidence gathered by wiretaps conducted pursuant to the orders of a Fulton County judge. 252 Ga. 312. Law enforcement's surveillance team worked out of a rented motel room in Fulton County. Forty-one telephones in eight judicial circuits were tapped. All appearance points involved in the surveillance were located in the same county as the telephone to be tapped, and a number of judicial circuits were represented in those counties. At the appearance points, "an inductor coil/jumper wire" was placed in order to decrease the risk of detection from "drop[s] in voltage measurable by equipment available to commercial gamblers." 252 Ga. at 313. The control unit was located at the listening post in the motel room. There,

"when the signal reached the listening post, it passed through the control unit to the computerized pen register, and then to the tape recorder. The function of the pen register was to record on paper tape the date and time that the tapped phone was taken off the hook; whether the call was incoming or outgoing; if outgoing, the number dialed; and the time the call ended. The tape recorder aurally recorded the conversation on magnetic tape." 252 Ga. at 314.

In deciding that the evidence obtained by the extraterritorial orders need not be suppressed, the court examined the federal and Georgia wiretap statutes. The interception analysis which was cited and adopted in *Rodriguez* and *Burford* is developed in the court's discussion of the federal statutes. Turning to state law, the court stated that it "involves not the place of interception (aural acquisition), but the place where a 'device' is physically placed." 252 Ga. at 317. According to the Georgia court, the pertinent statutes stated:

" '[U]pon written application, under oath, of the *district attorney of the circuit wherein the device is to be physically placed* . . . any judge of the superior court *of the circuit aforesaid* may issue an investigation warrant permitting the use of devices, as defined by Code Section 16-11-60 (Code Ann. § 26-3009), for the surveillance of such person or place. . . .' (Emphasis supplied.)

"The word 'device' is defined in OCGA § 16-11-60(1) (Code Ann. § 26-3009) as 'an instrument or apparatus used for overhearing, recording, intercepting, or

transmitting sounds . . . and which involves in its operation electricity [or] electronics. . . .' " 252 Ga. at 317.

The defendants argued that the inductor coil was a "device" within the meaning of the statute because it is a piece of equipment essential to the success of the wiretap which "intercepted" sounds and "transmitted" them to the listening post. The State argued that the control unit, computerized pen register, and tape recorder were the "devices." 252 Ga. at 317. The court noted that if the authorization had been issued in the judicial district where the inductor coil was located, the defendants undoubtedly would be arguing for suppression on the ground that the devices for intercepting, recording, and eavesdropping were located in Fulton County. 252 Ga. at 318. The court stated that the defendants' argument would require a separate authorization and recording device in each judicial district, but that it found no indication in the statutes that the legislature intended such a result. 252 Ga. at 318.

The conclusion of the court follows:

"We therefore conclude that the inductor coil involved here was not a device used to overhear, record or intercept defendant's conversations within the meaning of OCGA §§ 16-11-60(1) (Code Ann. § 26-3009), 16-11-64(b)(1) (Code Ann. § 26-3004). The coil was a device to prevent detection of those devices being used to overhear and record defendants' conversations, which devices were physically located in Fulton County. We are supported in this conclusion by the fact that had these officers proceeded as they did but without a warrant, their offense [interception of a telephone communication; OCGA § 16-11-62(4) (Code Ann. § 26-3001)] would have been committed in Fulton County and they could have been prosecuted there." 252 Ga. at 318.

Thus, the trial court's refusal to suppress the evidence obtained by wiretaps was affirmed.

The opinion in *Evans* is very persuasive authority that the district court in the present case did have jurisdiction to order use of the pen register. What is said in *Evans* is applicable to the present case. The detection protection function of the slave unit in the present case parallels that of the inductor coil in *Evans*. Neither is used to decipher and record or overhear and record. Each helps to ensure the success of the surveillance by decreasing the risk of detection. Each makes a vital contribution toward the

ultimate success of the surveillance, but neither is strictly necessary for the interception and recording of voice communications or electronic impulses.

We conclude that the district court incorrectly held that it did not have jurisdiction to authorize the use of the pen register in the present case. Therefore, it was error to suppress the evidence obtained through use of the pen register and the wiretaps.

We next consider the trial court's rationale for dismissing Counts IV, VI, VIII, and X, which allege that defendant used a telephone to arrange the sale or purchase of controlled substances in violation of K.S.A. 65-4141. The district court stated in its order of dismissal: "At no time were violations of K.S.A. 65-4107 specifically brought to the attention of Justice Lockett, nor was any subsequent application made to him to include evidence of those crimes at any time, let alone as soon as practicable." K.S.A. 65-4107 lists controlled substances. The State suggests that 65-4107 is a typographical error and that the district court intended to dismiss the counts for failure to specify K.S.A. 65-4141.

K.S.A. 65-4141 provides, in pertinent part:

"[I]t shall be unlawful for any person knowingly or intentionally to use any communication facility in conspiring or soliciting, as defined in article 33 of chapter 21 of the Kansas Statutes Annotated, or facilitating any felony violation of K.S.A. 65-4127a and 65-4127b and amendments thereto. Each separate use of a communication facility may be charged as a separate offense under this subsection.

"(b) As used in this section, 'communication facility' means any and all public and private instrumentalities used or useful in the transmission of writing, signs, signals, pictures or sounds of all kinds and includes telephone, wire, radio, computer, computer networks, beepers, pagers and all other means of communication."

Count IV of the amended information states:

"That on or about the 10th day of July, 1992, within Riley County and the State of Kansas, one BRANDON KELLY GIBSON then and there being present, did unlawfully, willfully, knowingly or intentionally, and feloniously use a communication facility, to-wit: a telephone, to conspire, solicit, or facilitate a felony violation of K.S.A. 65-4127a or 65-4127b and amendments thereto, contrary to K.S.A. 65-4141 and amendments thereto. **(Unlawfully Arranging Sales or Purchases of Controlled Substances Using a Communication Facility) (Class D Felony)**"

With the exception of the date, Counts VI, VIII, and X are identical to Count IV. K.S.A. 65-4127a and -4127b identify unlawful acts, such as possessing and selling, regarding controlled substances.

In the district court, Gibson argued that K.S.A. 22-2516 requires the wiretap application to specify the statutory violations for which the suspect is being investigated. He relied on *State v. Kuchinsky,* 3 Kan. App. 2d 224, 592 P.2d 144 (1979).

K.S.A. 22-2516(1)(b) provides that each application for an order authorizing the interception of a wire, oral, or electronic communication shall include "[a] full and complete statement of the facts and circumstances relied upon by the applicant to justify such applicant's belief that an order should be issued, including (i) details as to the particular offense that has been, is being or is about to be committed." It is the State's position that the statutory requirement was satisfied by the 50-page affidavit of Kim Nelson, a Riley County detective, which was attached to and incorporated into the application to Justice Lockett. Moreover, the State contends that it was specifically stated in the conclusion of the application that the targets were using the telephone to facilitate the distribution of illegal drugs, the activity which is proscribed by K.S.A. 65-4141. The pertinent portion of the conclusion of the application states:

"[P]robable cause exists to believe that Brandon Kelly Gibson, John A. Delbane, Christopher D. Glenn, and the persons listed in Sections III and IV of this application have committed and are committing felony offenses in violation of the Uniform Controlled Substances Act and *that telephone number 913-539-8845 located at 410 S. Juliette, basement,* Manhattan, Riley County, Kansas, and *telephone numbers 913-539-6325, and 913-539-1861,* located at 5617 Elbo Bluff Drive, Manhattan, Pottawatomie County, Kansas, *have and will continue to be used to commit those same offenses by those same persons."* (Emphasis added.)

Gibson characterizes this as substantial rather than strict compliance with K.S.A. 22-2516(1)(b) and argues that substantial compliance is not good enough.

K.S.A. 22-2516(1) provides what a wiretap application should include. K.S.A. 22-2515(6), now K.S.A. 1993 Supp. 22-2515(f), provides for the use of intercepted communications. Both are

mentioned in conjunction with the district court's dismissal of Counts IV, VI, VIII, and X because use depends on the contents of the application and authorization. Most of the arguments of the parties are couched in terms of the application made to Justice Lockett for the wiretap. Pertinent portions of the order authorizing interception state:

"[T]here is probable cause to believe that Brandon Kelly Gibson, Christopher D. Glenn, John A. Delbane, and others known and unknown have been and will be in violation of K.S.A. 65-4127a, sale of cocaine and possession with intent to sell cocaine; K.S.A. 65-4127b, possession with intent to sell and sale of marijuana/tetrahydrocannabinol and the offenses of conspiracy to commit the above listed offenses as defined by K.S.A. 21-3302. Further, that said *persons are using telephone numbers 913-539-8845, 913-539-6325 and 913-539-1861, in furtherance of said criminal offenses.*

. . . .

". . . There is *probable cause to believe* that the facilities from which and the place from where the wire communications are to be intercepted, to-wit: telephone number 913-539-8845, 410 S. Juliette, basement, Manhattan, Riley County, Kansas, 913-539-6325 and 913-539-1861 located at 5617 Elbo Bluff Drive, Manhattan[,] Pottawatomie County, Kansas, are being used and will be used in the future in connection with the above listed crimes.

. . . .

". . . It Is Ordered That:

. . . .

". . . Telephone communications concerning possession with intent to sell and sale of cocaine as defined by K.S.A. 65-4127a, possession with intent to sell and sale of marijuana/tetrahydrocannabinol as defined by K.S.A. 65-4127d and the offense of conspiracy to commit the above listed offenses as defined by K.S.A. 21-3302, have been, are being, or will in the future be received and made over those telephone numbers and that any communications furthering and confirming such offenses are the type of communications to be intercepted." (Emphasis added.)

## K.S.A. 1993 Supp. 22-2515(f) provides:

"When an investigative or law enforcement officer, while engaged in intercepting wire, oral or electronic communications in the manner authorized by this act, intercepts wire, oral or electronic communications relating to offenses *other than those specified in the order authorizing the interception* of the wire, oral or electronic communication, the contents thereof and evidence derived therefrom may be disclosed or used as provided in subsections (b) and (c) of this section. Such contents and evidence derived therefrom may be used under subsection (d) of this section when authorized or approved by a judge of com-

petent jurisdiction, where such judge finds on subsequent application, made as soon as practicable, that the contents were otherwise intercepted in accordance with the provisions of this act, or with chapter 119 of title 18 of the United States code." (Emphasis added.)

In *Kuchinsky*, 3 Kan. App. 2d 224, a panel of the Court of Appeals affirmed the district court's suppression of evidence obtained through wiretaps on the ground that the State had failed to comply with K.S.A. 22-2515(6). Kuchinsky and his codefendants (collectively, Kuchinsky) were charged with conspiracy to sell marijuana. They were not charged with any offense involving cocaine or heroin. The court order authorizing wiretaps "related only to cocaine and/or heroin," but "included the following language, 'and other related but presently unknown drug distribution conspiracies . . . and the relationship of this cocaine distribution conspiracy to other illegal activities.' " 3 Kan. App. 2d at 225. Neither marijuana nor marijuana-related offenses were mentioned in the order. Kuchinsky argued that the State could not introduce conversations relating to the sale of marijuana because it had not complied with K.S.A. 22-2515(6). The State contended that the offenses of sale of cocaine and marijuana are so similar that the order pertained to both and/or that the marijuana sales were a necessary part of the cocaine conspiracy. 3 Kan. App. 2d at 226-27.

The Court of Appeals stated:

"Had the defendants been charged with trafficking in cocaine or heroin, the marijuana-related conversations probably would have been admissible for the purpose of showing marijuana sales generated the funds for heroin and cocaine purchases. Here, however, the defendants were not charged with either cocaine or heroin trafficking or any other offense involving those specific drugs; they were charged with marijuana offenses. We think this distinction is highly relevant and determinative of the issues in this case." 3 Kan. App. 2d at 227.

After examining federal cases which involved the question of the government's use of wiretap evidence for the purpose of establishing commission of an offense not named in the authorization order, the Court of Appeals concluded that the State had failed to comply with the requirement of K.S.A. 22-2515(6). The Court of Appeals reasoned:

"In the instant case, the affidavit given to acquire the January 12, 1977, order did refer to intercepted conversations relating to 'elbows' or marijuana; and the district court's order of January 12, 1977, did repeat some of the language of the affidavit, although none of it related to the marijuana conversations.

"It should be noted, however, that the judge who issued the January 12 order did not, expressly or implicitly, incorporate the 'marijuana relating' provisions of the affidavit by reference. Nor did the State, either orally or in writing, request not only an extension but also an amendment of the December 11 order, to protect the 'marijuana conversations' as evidence of *marijuana* offenses. The State did not clearly 'notify' the issuing court of the inadvertent evidence, and the pertinent paragraphs of the January 12 affidavit are insufficient to inform a judge that the marijuana related conversations would be considered as evidence of anything but part of the cocaine scheme." 3 Kan. App. 2d at 230.

Gibson contends that the present case is controlled by *Kuchinsky* and the disposition must be the same. In other words, he argues that the State failed to protect evidence of the telephone calls as evidence of *telephone* offenses.

The State contends that *Kuchinsky* should be distinguished on factual grounds. The State argues that in the present case, the offense with which Gibson is charged is described in the application. Thus, the offense of unlawfully arranging the distribution of controlled substances using a communication facility is not an offense "other than those specified in the order authorizing the interception" and is not subject to application of K.S.A. 1993 Supp. 22-2515(f). We agree. A telephone wiretap application based on the representation that the telephone or telephones are being used by the targeted individuals to commit violations of the controlled substances act inherently and necessarily informs the authorizing judge that evidence may be gathered relating to the offense of unlawfully arranging the sale of controlled substances using a communication facility in violation of K.S.A. 65-4141.

Gibson's response to this argument is not that use of the telephone is not mentioned in the application, but rather that it is mentioned only in connection with a general allegation of violations of the controlled substances act and not in connection with specified offenses. He cites no authority for the proposition that the unlawful use of the telephone must be stated with more specificity than "arranging sales or purchases of controlled substances," as it is stated in the amended information.

K.S.A. 1993 Supp. 22-2515(f) permits "communications relating to offenses other than those specified in the order authorizing the interception" to be used as evidence only upon timely application and judicial approval. The statutory language easily could have been "offenses other than those specified by statute number in the order authorizing the interception," but it is not. We do not view *Kuchinsky* as authority for interpreting the statute as requiring the statute number to be stated in addition to a description of the unlawful conduct. The principle set out in *Kuchinsky* is that specifying a conspiracy to distribute cocaine or heroin does not also specify a conspiracy to distribute marijuana.

The evil which limitations on the use of intercepted communications seeks to control is the use of court-authorized intrusion into private conversations as a general search warrant. 3 Kan. App. 2d at 229. In *Kuchinsky*, for example, the Court of Appeals seems to have concluded that the State obtained wiretap authorization for one type of drug offense and that authorization became a pretext for intercepting and gathering evidence of other offenses. In federal court opinions, the specific evil which limitations on the use of intercepted communications relating to offenses other than those specified in the order is said to be directed at is " 'the electronic equivalent . . . of a "general search warrant." ' *United States v. Brodson*, 528 F.2d 214 [, 215] (7th Cir. 1975)." *United States v. Marion*, 535 F.2d 697, 701 (2d Cir. 1976).

Although cited by the State to support its position, *Brodson* and *Marion* seem to offer more support for Gibson's position than for the State's. In *Brodson*, the district court dismissed the indictment for the transmission of wagers and wagering information in interstate commerce in violation of 18 U.S.C. § 1084 (1988) on the ground that the evidence supporting the indictment was obtained through wiretaps authorizing interceptions of communications relating to violations of 18 U.S.C. § 1955 (1988). Section 1955 prohibits operation of an illegal gambling business in interstate commerce. The government's first line of defense to Brodson's motion to dismiss was that the transmission of wagers and wagering information in interstate commerce was not an offense other than that specified in the wiretap authorization—op-

eration of an illegal gambling business in interstate commerce. The Seventh Circuit Court of Appeals rejected the contention on the following grounds: "[T]he two offenses are wholly separate and distinct; they involve dissimilar elements and require different evidence, even though some of it might overlap because both concern illegal gambling." 528 F.2d at 216. For the appellate court, however, the controlling factor was not the dissimilarity of the offenses but rather the government's failure "to present the evidence it obtained under the Section 1955 authorization to the trial judge for him to determine whether it was admissible and was sufficient to meet the burden of the prosecution under Section 1084." 528 F.2d at 216. "The Government's application under § 2517(5) was not filed in this case until March 3, 1975, just prior to trial and some eight months after the indictment was returned by the Grand Jury that considered the intercepted conversations." 528 F.2d at 215.

In *Marion,* there were several wiretap authorizations. In one, the "Lounge order," State authorities obtained authorization

"to intercept communications providing evidence of various state offenses, including grand larceny by extortion and conspiracy to commit that crime. The fruits of the tap were later used before a federal grand jury conducting an investigation into possible violations of 18 U.S.C. §§ 1951, 371 (interference with interstate commerce by threats or violence, interstate travel and transportation in aid of racketeering)." 535 F.2d at 703.

With regard to the "Lounge order," the appellate court concluded that subsequent judicial approval "was provided in the renewal of that order." 535 F.2d at 703.

A second authorization, the "Delmonico order," "was directed to proof of, *inter alia,* the state crime of illegal possession of dangerous weapons." 535 F.2d at 703. Communications intercepted pursuant to the "Delmonico order" were "used to question Marion before the [federal] grand jury about possible violations of the federal statute concerned with the transportation and transfer of an unregistered firearm through interstate commerce, 18 U.S.C. §§ 371, 922." 535 F.2d at 703-04. The appellate court concluded that transportation and transfer of an unregistered firearm through interstate commerce was an offense "separate and

distinct" from the state crime of illegal possession of dangerous weapons, which was the offense specified in the wiretap order. 535 F.2d at 704. Indeed, the court stated that "[i]t is clear beyond all doubt" that the federal and state offenses were separate and distinct. 535 F.2d at 704. Because the government failed to obtain the subsequent judicial approval required by the statute for the interception of conversations relating to the federal offense, the court overturned several of Marion's convictions. 535 F.2d at 704.

Even though Gibson might have argued that *Brodson* and *Marion*, *Brodson* in particular, support his position and the district court's dismissal of Counts IV, VI, VIII, and X, he steadfastly denied the applicability or even persuasive value of federal cases. Gibson contends that Kansas courts offer greater protection from unlawful electronic surveillance than do the federal courts. He supports his assertion by contrasting the Kansas Court of Appeals' decision in *State v. Adams*, 2 Kan. App. 2d 135, 576 P.2d 242, *rev. denied* 225 Kan. 845 (1978), with *U.S. v. Burford*, 755 F. Supp. 607 (S.D. N.Y. 1991). However, the contrast in the outcomes of *Adams* and *Burford* may be explained by their differing facts. In *Adams*, every component of the wiretap which had been authorized by a Johnson County judge was located in a separate judicial district in Wyandotte County. In *Burford*, an out-of-state telephone was tapped upon the authorization of a district court judge sitting in New York, but all the monitoring was done in New York using equipment which was located there.

Gibson contends that in the past, this court has narrowly construed statutes governing electronic eavesdropping and required strict compliance. In addition to *Adams*, he cites *In re Olander*, 213 Kan. 282, 515 P.2d 1211 (1973), in which evidence, derived through a wiretap authorization issued upon the application of an assistant county attorney, was suppressed because the statute provided that an application should be made by the county attorney. In reaching its decision in *Olander*, this court examined federal statutes, legislative history, and case law. 213 Kan. at 285-87. The actual basis for its decision, however, seems to be the familiar canon of statutory construction, *expressio unius est exclusio alterius*. It also may be noted that Justices Fatzer and Schroeder

dissented "from the overly strict construction which the majority of the court would place on" the statute. 213 Kan. at 287.

The State concedes that Kansas courts may regulate electronic surveillance more closely than the federal courts do. The State contends, however, that "where the legislature has formulated statutes identical to the federal code, there is no apparent logical reason to assume the legislature intended the Kansas Code to be more restrictive than its federal counterpart."

The State urges this court to concentrate on the purpose of the statutory provisions in question. In particular, the State brings to the court's attention the following discussion from *United States v. Van Horn*, 789 F.2d 1492, 1503 (11th Cir. 1986):

"The purpose of the judicial approval limitation is to prevent incidental interception of conversations for which the government has shown no probable cause; the statute does not ensure that a defendant is charged only with the crimes set forth in the application. In considering whether the judicial approval required by the statute has occurred, courts must keep in mind this purpose. [Citation omitted.] Courts thus have considered the section 2517(5) approval requirement flexibly, and have held that the court need not have approved of the new charges as long as it has approved of the collection of the evidence supporting those charges. [Citations omitted.]"

We find that the application and affidavit of Detective Nelson were sufficient to meet the requirements of K.S.A. 22-2516(1)(b) and were adequate to inform the authorizing judge that evidence of violations of K.S.A. 65-4141 would be obtained by the use of the wiretap.

Here, the application and affidavit of Detective Nelson were filed with this court. The two county attorneys, as applicants along with Detective Nelson, personally appeared before Justice Lockett. Justice Lockett, as the authorizing judge, read the application and affidavits, found the requisite probable cause, and authorized the wiretaps. This suffices to meet the statutory requirements of K.S.A. 22-2516 and is not violative of the above-stated purpose for requiring judicial approval. We therefore conclude that it was error to dismiss Counts IV, VI, VIII, and X.

The judgment of the district court dismissing the charges against the defendant is reversed, and the case is remanded with directions to set aside the dismissal.