# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00043-CR

**Radu Paul Laurentiu, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 368TH JUDICIAL DISTRICT
NO. 02-036-K368, HONORABLE BURT CARNES, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

A jury found appellant Radu Paul Laurentiu guilty of two counts of robbery. Tex. Pen. Code Ann. § 29.02 (West 2003). In four issues Laurentiu contends that his conviction should be reversed because the trial court erred by (1) admitting evidence obtained in violation of his Fourth Amendment rights; (2) admitting evidence of extraneous offenses and other bad acts without proper notice under article 37.07, section 3(g) of the Texas Code of Criminal Procedure; (3) refusing to grant a new trial after the State violated a motion in limine; and (4) admitting evidence in violation of rules 401 and 403 of the Texas Rules of Evidence. For the reasons that follow, we affirm the conviction.

## BACKGROUND

On November 6, 2001, bank tellers Anna Reilly and Patricia Grunbar were closing the Compass Bank branch in Round Rock when a masked man overpowered Grunbar and entered through the rear door. The man was wearing dark clothes and wielded a stun gun and an air pistol. He ordered the tellers to open the main vault; however, the tellers led him to the drive-through area and began to disperse money from the teller vault and drawers. Reilly placed bait money, consisting of a packet of bills with prerecorded serial numbers, and a tracking device, inside the bag with the other money. The robber told the tellers to lie on the floor and wait for five minutes and then he left the bank with $32,663 in cash. Moments later, Reilly and Grunbar pressed various panic buttons located in the bank and called 911.

Austin police officer Richard Muñoz received an alert about the robbery that described the suspect as a male carrying a silver gun and wearing a gray shirt, black pants, ski mask, and gloves. Muñoz tracked the signal emanating from the bait money to a Wingate Inn Hotel in Austin. Numerous police officers and a helicopter, also tracking the signal, already had arrived at the hotel parking lot. Shortly after Muñoz arrived, it was determined that the signal was coming from the north side of the hotel.[1] After observing Laurentiu and his wife sitting motionless in a truck in the parking lot, Muñoz and fellow Austin police officer Sergeant Earl Hall approached the truck and ordered Laurentiu and his wife to exit the vehicle. Muñoz testified that except for the truck the parking lot was empty and no other people were present. Laurentiu's clothing was covered with leaves and twigs and he was perspiring and breathing heavily. Hall, who died before trial, prepared

---

[1] To the north of the hotel was the parking lot and then a wooded area.

a report stating that he asked Laurentiu why he was covered in leaves. Laurentiu's initial response was that he was jogging, but he then said he was doing push-ups in the parking lot to wake himself up. The report then states that Hall asked for permission to look inside the truck for the registration, insurance, and any weapons; Laurentiu replied that "there were none but he could look for himself." The report states that Hall reached inside the truck and seized a stun gun from the center console. After Laurentiu and his wife were arrested for bank robbery, the truck was impounded and a police evidence technician located a glove and a roll of duct tape in the truck's bed.

Officers located a black bag containing over $30,000 in paper currency, including the bait money, in a wooded area adjacent to the hotel parking lot later that evening. They returned the next morning and recovered a glove, black jeans, and a silver air pistol. The bait pack matched the prerecorded serial numbers of the bills from Compass Bank. A paper towel with drops of blood later determined to be Laurentiu's was discovered in the back pocket of the jeans. During the punishment phase, Laurentiu admitted he robbed the Compass Bank and conceded that the air pistol, stun gun, black bag, black jeans, and gloves belonged to him.

Prior to trial, Laurentiu's attorney filed a request for notice of extraneous offenses under article 37.07 of the Texas Code of Criminal Procedure. The State filed a notice that listed reckless conduct and driving with a suspended license, two offenses that occurred in Illinois, and a theft by check.[2] Trial began on December 8, 2003, and on December 10, the State filed a written supplemental notice of intent to introduce extraneous offenses and bad acts. The second notice listed

---

[2] The State never referred to the theft by check offense during either the guilt/innocence or punishment phase of the trial.

3

an uncharged robbery, suspended license, two uncharged assaults, and a history of family violence against Laurentiu's wife. The trial court granted Laurentiu's motion in limine to cover referencing the offenses listed in the second notice. Laurentiu was found guilty of two counts of robbery.

At sentencing, the State referred to the probation Laurentiu received for reckless conduct and driving with a suspended license before the pre-trial motion in limine covering Laurentiu's criminal record was lifted. The trial court refused Laurentiu's attorney's request for a new trial and later admitted a certified copy of the Illinois conviction into evidence. Over objections by Laurentiu's attorney, the trial court allowed the State to cross-examine his relatives about the uncharged robbery and domestic violence listed in the supplemental notice. The court permitted the State to introduce a letter Laurentiu wrote to his wife concerning the conditions of his incarceration. Laurentiu received a twenty-year sentence. This appeal followed.

## DISCUSSION

Laurentiu brings forward four issues on appeal. He first contends that the trial court erred in denying his motion to suppress evidence of the stun gun at the guilt-innocence phase. He then challenges the admission of extraneous offenses and other bad acts on the basis of improper notice, the denial of a motion for new trial in response to the State's violation of the motion in limine, and the admission of the letter to his wife on grounds of irrelevance and undue prejudice.

### *Motion to Suppress*

Laurentiu filed a motion to suppress the stun gun obtained from his truck on the theory that the search that produced the weapon was the product of an illegal detention. The trial

4

court overruled the motion. The appropriate standard for reviewing a trial court's ruling on a motion to suppress evidence is to give almost total deference to a trial court's determination of historical facts and to review *de novo* the court's application of the law of search and seizure. *Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). We review the evidence in a light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact supported by the record. *Carmouche*, 10 S.W.3d at 328. We review *de novo* the trial court's application of Fourth Amendment standards. *Id.*

An officer may briefly detain an individual if the officer has reasonable suspicion that a person is involved in criminal activity. *Davis v. State*, 989 S.W.2d 859, 863 (Tex. App.—Austin, 1999, pet. ref'd). The officer must have specific articulable facts which, in light of his experience and personal knowledge, together with inferences from those facts, would create reasonable suspicion and justify intruding on the freedom of the citizen detained for investigation. *Id.* The reasonableness of an investigative detention turns on the totality of the circumstances. *Id.*

At the time Muñoz initially detained Laurentiu, he knew that a bank robbery had been committed; that bait money had been placed in the robber's possession; that the bait money was tracked and located on or near the Wingate Inn's north parking lot or the adjacent wooded area; that Laurentiu was covered in leaves and sticks; that the truck was facing north towards the wooded area; that Laurentiu and his wife were sitting motionless inside a truck in the Wingate Inn parking lot; that despite the increasing police presence neither Laurentiu nor his wife displayed any noticeable concern; that no other people were observed in the parking lot; that the robber was described as a

5

thin, white male wearing a grey sweater; and, that Laurentiu was wearing a grey sweatshirt. Muñoz had a reasonable suspicion, based on these facts and rational inferences, that Laurentiu was connected to the bank robbery. Thus, Laurentiu's detention was justified, and the stun gun is not inadmissible on the ground that it is the product of an illegal detention.

Laurentiu argued further that there was no exception to the warrant requirement which would have enabled Hall to seize the stun gun. At the suppression hearing, the State argued that three exceptions applied: a *Terry* frisk for officer safety, plain view, and consent. The trial judge admitted the evidence based on the plain view or the officer safety exception. We agree with the trial court that the plain view exception applied in this case.

For the plain view exception to the warrant requirement to apply, two conditions must be met: (1) the officer must be in a proper position to view the item or lawfully be on premises, and (2) the fact that the officer has discovered evidence must be immediately apparent. *Joseph v. State*, 807 S.W.2d 303, 308 (Tex. Crim. App. 1991). The immediately apparent prong does not require actual knowledge of incriminating evidence. *Id*. (citing *Texas v. Brown*, 460 U.S. 730, 742-44 (1983)). Essentially, the officer must believe that the evidence discovered is associated with criminal activity. *Id*.

The record contains evidence that meets both requirements. Although Hall died before trial, his report was admitted into evidence during the suppression hearing. Muñoz's testimony and Hall's report provide evidence that Hall was in a proper position to view the item. The report states that Hall received Laurentiu's consent to look inside the truck for vehicle papers and accessible weapons. Muñoz testified that Laurentiu and his wife had left the truck doors open

6

when they exited and that he believed the gun was in plain sight because Hall reached in "as if you reached in to grab your car keys out type maneuver." Furthermore, the photograph taken of the truck at the crime scene reveals that the center console lid was not shut because it was filled beyond capacity. Likewise, Muñoz's testimony indicates that at the time of seizure, it was apparent that the stun gun was evidence. Muñoz testified that Hall informed him that the suspect description included a stun gun. Reviewing the evidence in a light most favorable to the trial court's ruling and assuming implicit findings of fact supported in the record, we conclude that both prongs of the plain view exception have been met and that the trial court's denial of the motion to suppress was not in error.

In any event, if it were error to admit the stun gun into evidence, Laurentiu was not harmed. Admission of evidence obtained from an improper search is subject to the test for harmless constitutional error. *See Jordan v. State*, 576 S.W.2d 825, 829 (Tex. Crim. App. 1978). The test is not whether the conviction could have been had without the improperly admitted evidence but whether there is a reasonable possibility that the complained of evidence might have contributed to the conviction or the punishment assessed. *See Castillo v. State*, 810 S.W.2d 180, 184-85 (Tex. Crim. App. 1990); *see also* Tex. R. App. P. 44.2(a).

After Laurentiu was placed in custody, the police searched the wooded area adjacent to the hotel parking lot and discovered: a black bag containing over $30,000 in cash, including the bait money; a glove; a pair of black jeans containing a paper towel with Laurentiu's blood on it; and a silver air pistol. Furthermore, when the indictment for aggravated robbery was announced at the beginning of the guilt-innocence phase of the trial Laurentiu responded, "not guilty, guilty to robbery." Additionally, during Laurentiu's opening statement his counsel asserted that Laurentiu

7

made a mistake, was extremely ashamed of what he had done and that he never intended to harm anyone. With regard to punishment, Laurentiu admitted that he robbed Compass Bank, that items found in the wooded area were his, and that he carried the stun gun during the robbery. We find beyond a reasonable doubt that the admission of the stun gun into evidence did not contribute to Laurentiu's punishment or conviction because of the volume of evidence that was located and elicited independent of the search of the truck. We overrule Laurentiu's first issue.

### *Proper Notice*

In his second issue, Laurentiu challenges the sufficiency of both of the State's notices of extraneous offenses and other bad acts, which were presented during the punishment phase of the trial. Tex. Crim. Proc. Code Ann. art. 37.07, § 3(g) (West Supp. 2004-05). The trial court ruled that notice was sufficient for all the offenses introduced.

We review the admission of evidence of extraneous offenses for an abuse of discretion. *Roethel v. State*, 80 S.W.3d 276, 280 (Tex. App.—Austin 2002, no pet.). We will affirm the trial court's decision if it is within "the zone of reasonable disagreement." *Id.* Article 37.07, section 3(g) limits the trial court's discretion to admit evidence of extraneous offenses at the punishment phase and provides that notice for unadjudicated offenses is reasonable only if it includes the date on which and the county in which the alleged crime or bad act occurred. *Id.* Because the statute does not provide guidance on determining whether the timeliness of notice is reasonable, the reasonableness of the State's notice turns on the facts and circumstances of each case. *Patton v. State*, 25 S.W.3d 387, 392 (Tex. App.—Austin 2000, pet. ref'd).

8

Laurentiu argues that the initial notice did not comply with the requirements of article 37.07, section 3(g) because it listed the date of conviction rather than commission of the offense and listed the county as "Page" rather than "Dupage." However, the statute requires inclusion of the date and county in which the crime or bad act occurred only if the extraneous crime or bad act has not resulted in a final conviction. Unlike alleged bad acts, Laurentiu should be aware of his previous convictions. The first notice included Laurentiu's Illinois conviction record. As such, the notice complied with both article 37.07 and the court-ordered filing deadline. We hold that the trial court did not abuse its discretion in determining that the first notice was reasonable.

It is unnecessary for us to decide the reasonableness of the supplemental notice because the State did not introduce any extraneous offense or bad act listed in it during its case-in-chief in the punishment phase. The notice requirements of article 37.07, section 3(g) encompass only case-in-chief evidence. *Jaubert v. State*, 74 S.W.3d 1, 3 (Tex. Crim. App. 2002). When the State introduces extraneous offense evidence during cross-examination to mitigate evidence offered by the defendant, advance notice of intent to offer the extraneous offense evidence is not possible. *Id.* at 4 ("In such a situation, the defendant, rather than the State, determines whether a contested issue will be raised, and his determination will not be made known until he presents his case. It would be practically impossible for the State to give notice until that time.").

In this case, the State cross-examined Laurentiu's character witnesses regarding their knowledge of the uncharged robbery and incidents of domestic violence listed in the supplemental notice rather than introducing extraneous offense evidence during its punishment case-in-chief. The facts of this case fall under Texas Rule of Evidence 405 rather than article 37.07. Under Rule 405,

9

a witness who testifies to a defendant's good character may be cross-examined to test the witness's awareness of relevant specific incidents of conduct. *Wilson v. State*, 71 S.W.3d 346, 350 (Tex. Crim. App. 2002). The right of a party to cross-examine a character witness is subject to two limitations. *Id.* at 350. First, the incidents inquired about must be relevant to the character issues at hand. Second, the alleged bad act must have a basis in fact. *Id.* at 351. The foundation for inquiring into the specific instances of conduct should be laid outside the jury's presence so the judge will have the opportunity to rule on the propriety of asking them. *Id.*

The State rested its case after opening arguments and then Laurentiu's attorney introduced a series of witnesses for the stated purpose of showing how Laurentiu's family would contribute to his suggested rehabilitation plan if he received probation. In addition to testifying about the supervision the family could provide, some of the witnesses testified to Laurentiu's good character. Laurentiu's mother gave examples of his generous, loving nature and stated that "it's not in his character to do stuff like that." His brother testified that this was the first time the family had dealt with a situation like this and that Laurentiu had never lied to him. His sister stated that there was a disconnect between the bank robbery and what she knew of her brother. The family asserted that had Laurentiu been living near them, the bank robbery would not have occurred.

During a hearing out of the presence of the jury, the State established that it wished to test Laurentiu's family regarding their knowledge of his activities when he lived at home. The State established a good-faith basis for questioning the family because Laurentiu's wife told them that he confessed to her that he robbed a store as a teenager and also described domestic abuse incidents that occurred throughout their relationship. Although the uncharged robbery described by

10

Laurentiu's wife was shown during cross-examination to be a shoplifting incident, her statements provided the State with a good-faith basis for the inquiries. The incidents were relevant to the character issues at hand because Laurentiu's prior conduct rebutted the opinion that the bank robbery was inconsistent with his character, and domestic abuse rebuts Laurentiu's mother's description of his loving nature. Because the family testified as to their opinion of Laurentiu's character, the State was entitled to test their knowledge regarding specific instances of relevant conduct.

Even if the State's notice was deficient and, consequently, the trial court erred by overruling Laurentiu's objections, Laurentiu suffered no harm. In *Roethel,* we held that a defendant is harmed by deficient notice regarding extraneous offenses if, after examining the record, we conclude that the deficiency either was the result of prosecutorial bad faith or impaired the defendant's ability to prepare adequately. *See Roethel*, 80 S.W.3d at 282. Here, the State did not learn of the uncharged robbery and the incidents of domestic violence until they had an opportunity to interview Laurentiu's wife on the day before the guilt-innocence phase of the trial began. The next day the State informed Laurentiu's attorney and the trial court that it intended to supplement its previously filed notice of intent to introduce evidence of extraneous offenses and bad acts.

Laurentiu contends that the State should have been more diligent in its search for evidence of extraneous offenses and bad acts and that this evidence could have been discovered earlier. However, Laurentiu's wife was initially charged as a co-conspirator in the bank robbery, and, while she was not indicted, she was represented by counsel before and during Laurentiu's trial. Furthermore, she resided out of state in the time leading up to trial. Additionally, all other potential sources of this information, Laurentiu's family and friends, also lived out of state. Finally, the record

11

reveals that Laurentiu was aware that the uncharged robbery listed in the notice referred to a shop lifting incident he was allegedly involved in as a youth. We conclude, based on our review of the record, that the State did not act in bad faith and that Laurentiu was able to prepare adequately to meet this evidence despite any deficiency in the notice. We overrule Laurentiu's second issue.

***Violation of Motion in Limine***

The State referred at trial to the probation Laurentiu received for his Illinois convictions for reckless conduct and driving with a suspended license, both of which were covered by a pretrial in limine order. Laurentiu objected and requested a mistrial. The trial court instead directed the jury to disregard the State's comment and then lifted the in limine order for the extraneous offenses covered in the first notice. Laurentiu asserts on appeal that the trial court erred by refusing to grant a mistrial.

The denial of a motion for a mistrial is reviewed under an abuse of discretion standard. *Trevino v. State*, 991 S.W.2d 849, 851 (Tex. Crim. App. 1999). Ordinarily, a prompt instruction to disregard will cure error associated with an improper question or argument. *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000). In this case, the trial court did not abuse its discretion by refusing to grant a mistrial. Following the objection, the trial court properly lifted the motion in limine to admit evidence of extraneous offenses for which proper notice had been given. This circumstance, coupled with the trial court's instruction to disregard, rendered the State's failure to abide by the motion in limine harmless. We overrule Laurentiu's third issue.

12

*Relevance of Evidence*

Laurentiu asserts that the State violated Texas Rules Evidence 401 and 403 in its closing argument at punishment by referring to a letter he wrote to his wife while he was incarcerated prior to trial. The trial court overruled Laurentiu's objection that the letter was irrelevant to sentencing under Rule 401. The trial court also overruled Laurentiu's Rule 403 objection, which stated that even if the letter was relevant to sentencing, the probative value was substantially outweighed by unfair prejudice.

We review the trial court's rulings on the relevance, materiality, and prejudicial effect of evidence under an abuse of discretion standard. *See Montgomery v. State*, 810 S.W.2d 372, 378 (Tex. Crim. App. 1990). We will not reverse a trial judge whose ruling was in the zone of reasonable disagreement. *Jones v. State*, 944 S.W.2d 642, 651 (Tex. Crim. App. 1996).

Article 37.07 section 3(a) states that "evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing.*"* Laurentiu's attorney presented to the jury a rehabilitation plan involving probation, and then stated, "He's already been in custody for over two years. Since the day of this offense, he has been locked in a cage. And so part of that punishment has already been accomplished, and it's continuing every single day." In rebuttal, the State offered excerpts of a letter written by Laurentiu to his wife stating that the prison was "more like a dorm than a jail," that he got to play soccer, that he had a window, and he apologized to his wife for the pleasant conditions. He went on to say that he wrote the letter so that she could "feel at peace" with him being there. The purpose of introducing the letter was to rebut the defense attorney's reference to Laurentiu's being "locked in a cage." We hold that the trial court's

13

determination that the letter was relevant to sentencing was within the reasonable zone of disagreement and was, therefore, not an abuse of discretion. Laurentiu's final issue is overruled.

## CONCLUSION

In summary, we conclude the trial court did not err in denying Laurentiu's motion to suppress evidence at the guilt-innocence phase of trial and did not abuse its discretion by admitting evidence of extraneous offenses and other bad acts, by denying a motion for a new trial, or by admitting Laurentiu's letter. Thus, we affirm the conviction.

---

Bea Ann Smith, Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed

Filed:　January 21, 2005

Do Not Publish